Filed: January 7, 2002

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

———————————

Nos. 00-4851(L)
(CR-98-442)

———————————

United States of America,

Plaintiff - Appellee,

versus

Joseph Brooks Robinson, et al.,

Defendants - Appellants.

———————————

O R D E R

———————————

Upon consideration of appellants' petition for rehearing,

IT IS ORDERED that the petition for rehearing is granted for the limited purpose of making one revision to the opinion.

The court amends its opinion filed December 17, 2001, as follows: On page 14, first full paragraph, lines 4-8 -- the sentence beginning "In the first place" is deleted, and is replaced with the following sentence:

In the first place, while Longshore testified that both Appellants participated in telling the story of the murder, she did not state that their voices were jumbled together in such a way as to prevent her or each Appellant from hearing and understanding what was being said.

Entered at the direction of Judge Wilkins, with the concurrence of Judge Williams and Judge Michael.

For the Court


/s/ Patricia S. Connor
Clerk

Rehearing granted for limited purpose
of making one revision to opinion, by
order filed 1/7/02

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

            v.                                    No. 00-4851

JOSEPH BROOKS ROBINSON,
        *Defendant-Appellant.*


UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

            v.                                    No. 00-4853

STANLEY LEON OBANION, JR.,
        *Defendant-Appellant.*


Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CR-98-442)

Argued: October 29, 2001

Decided: December 17, 2001

Before WILKINS, WILLIAMS, and MICHAEL, Circuit Judges.

_____

Affirmed by published opinion. Judge Wilkins wrote the
opinion, in
which Judge Williams and Judge Michael joined.

_____

COUNSEL

**ARGUED:** Fred Warren Bennett, Greenbelt, Maryland; Martin Greg-
ory Bahl, FEDERAL PUBLIC DEFENDER'S OFFICE, Baltimore,
Maryland, for Appellants. Jan Paul Miller, Assistant United States
Attorney, UNITED STATES ATTORNEY'S OFFICE, Greenbelt,
Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public
Defender, Denise C. Barrett, Assistant Federal Public Defender, Balti-
more, Maryland, for Appellants. Stephen M. Schenning, United States
Attorney, UNITED STATES ATTORNEY'S OFFICE, Greenbelt,
Maryland, for Appellee.

_____

OPINION

WILKINS, Circuit Judge:

Joseph Brooks Robinson and Stanley Leon Obanion, Jr. (collec-
tively, "Appellants") appeal their convictions on various charges
stemming from a series of violent carjackings committed between
December 29, 1997 and January 2, 1998. Appellants maintain that
venue on one of the counts was improper; that evidence obtained dur-
ing searches of their homes should have been suppressed; and that the
district court abused its discretion in admitting the testimony of Crys-
tal Longshore. Additionally, Robinson maintains that he was deprived
of his statutory right to the assistance of two attorneys. For the rea-
sons set forth below, we affirm.

I.

On the evening of December 29, 1997, Appellants and two com-
panions, Larry Erby and Brian Brown, were walking through their
neighborhood in Fort Washington, Maryland, when Robinson stated
that "he needed a car for the night" and that he planned to rob some-
one. J.A. 475. After Obanion and Erby indicated assent to this plan
(Brown did not wish to participate), Robinson, who was armed with
a semi-automatic pistol, stepped into the street and attempted, unsuc-
cessfully, to flag down passing motorists. While these efforts were
ongoing, the group observed a green Acura pull into a driveway a

2

short distance down the street. Obanion took the firearm from Robinson and ran over to the vehicle, with Robinson and Erby following. As the driver, Louis Perkins, exited, Obanion pointed the gun at his head and demanded his keys and his wallet. While Perkins complied, Robinson and Erby got into the automobile; once he had Perkins' keys and wallet, Obanion entered the driver's seat and drove away.

Obanion drove the group to southeast Washington, D.C., where they came upon a man walking on the side of the road. Obanion pulled over and Robinson exited, holding the gun. He demanded money from the man, and when the man said he had none, Robinson shot him. After Robinson returned to the vehicle and Obanion drove away, Robinson said that he had shot the man "because he felt like it" and because he needed to kill someone in order to "earn his stripes," a tattoo to which one becomes entitled upon killing someone. J.A. 489.

As Appellants and Erby headed back toward Maryland, two of the tires on the stolen Acura blew out. As the men were trying to determine what to do, a tow truck driven by Matthew Dozier happened upon them and pulled over. Dozier towed the Acura to a neighborhood in the District of Columbia, where he unhooked the vehicle and began to fill out some paperwork in the cab of the tow truck. Robinson and Obanion, who were standing at the back of the Acura with Erby, began to argue about who should kill Dozier. Obanion won the argument by reminding Robinson that Robinson had already killed someone that night and that it was Obanion's turn to earn his stripes. Obanion shot Dozier four times as Dozier begged for his life. Appellants and Erby then got into the tow truck and began to drive away. As they pulled away from the curb, Robinson observed that Dozier was still moving. Obanion jumped out of the truck, ran back to Dozier, and shot him once more. Obanion returned to the truck, excited and singing. Dozier later died of the gunshot wounds inflicted by Obanion.

The group again headed toward Maryland, with Robinson driving the tow truck. On the way, Robinson stated that the group

needed to
steal another car for use the next day in more carjackings and rob-
beries. As they were driving through a residential neighborhood in
Maryland, they observed a white Nissan Maxima, which was driven

3

by Hurley Enoch. Robinson followed Enoch, eventually trapping him
in a cul-de-sac. Robinson stole Enoch's wallet at gunpoint and he and
Erby drove off in the Maxima; Obanion followed in the tow truck.
Shortly thereafter, Obanion abandoned the tow truck and joined Robinson and Erby in the Maxima.

Appellants drove Erby home, then proceeded to the home of Crystal Longshore, arriving at about 3:00 a.m. on the morning of December 30. Longshore and her boyfriend—whom Appellants had come to see—were asleep on the couch in the living room. From her position on the couch, Longshore listened as Robinson and Obanion described the murder of Dozier. She then watched as they acted out the scene, with Obanion playing the part of the doomed victim. Appellants also showed Longshore Dozier's wallet and driver's license. Later that morning, Longshore observed Appellants leave in a white Nissan Maxima.

At approximately 8:45 that evening, Corporal Copeland of the Prince George's County Police Department spotted the stolen Maxima. When Copeland turned on his emergency lights, the driver of the Maxima accelerated suddenly. Copeland chased the vehicle until it crashed into a parked automobile; as Copeland exited his patrol car, he observed the driver of the Maxima running away from the scene. Copeland called for assistance, and Corporal Landers responded to the scene with a police dog. Landers swept the area, leaving his patrol car running so that the vehicle would be warm when he and the dog returned to it. Upon returning to his starting point, Landers realized that his patrol car was gone. The vehicle was found approximately 40 minutes later, but several items, including a police jump suit, a raincoat, a neoprene mask, and a pair of gloves, were missing from the trunk.

Shortly after this incident, Obanion returned to Longshore's apartment carrying a police duffel bag. Obanion emptied the contents of the bag onto the living room floor, revealing the items stolen from the police vehicle. Robinson arrived at the apartment approximately 20 minutes later, out of breath. Robinson told those present that he had

just finished running from the police.

Three days later, on January 2, 1998, Appellants again met up with
Erby. Also present were Erby's brother, Leroy Erby (Leroy), and

4

Kenneth Maxwell. Obanion announced that he wanted to commit another carjacking and robbery that evening, and persuaded the others to help him by promising them a share of the proceeds of the robbery. Using a Datsun belonging to the Erbys' sister and driven by Leroy, the group proceeded to a suburban Maryland neighborhood, where Appellants and Maxwell exited the vehicle and began running through the yards. The three came upon Bruce Chase, who was removing packages and purses from his girlfriend's automobile. Robinson approached Chase and demanded the purses at gunpoint. Chase handed the purses to Robinson and began to back away, turning briefly to shout at his girlfriend, who had come outside, to get back in the house. When Chase turned around again, Obanion was pointing the gun at him. Chase's girlfriend then activated the panic alarm in the house, which could be heard outside. Upon hearing the alarm, Appellants and Maxwell ran back to the Datsun and all five men drove off.

Chase got into his own vehicle and pursued the Datsun. The pursuit eventually led to another neighborhood, where Chase briefly lost sight of the Datsun. While they were out of sight, Obanion exited the Datsun with the gun. When Chase drove into the neighborhood, Obanion shot at Chase's vehicle, striking Chase in the leg. Chase was able to drive away and get medical treatment.

Leroy drove the Datsun to another part of the same neighborhood, where Appellants exited. Appellants ran through the neighborhood and came upon Gloria Ryan, who was backing her minivan out of her garage. In the van were Ryan's two children, aged six and five, and an infant whom Ryan was babysitting. Ryan heard a thump behind her and stopped, believing that she had hit someone or something. She turned to find Robinson standing next to the driver's side door, pointing a gun at her head. Robinson demanded that she get out of the minivan and hand over the keys. After telling her children to get out of the vehicle, Ryan exited as well. Obanion removed the car seat holding the infant and threw it on the lawn.

Appellants then drove to where the Erbys and Maxwell were wait-

ing and picked them up. As they were driving away, they were spot-
ted by police, who pursued them to their neighborhood in Fort
Washington. Obanion, who was driving, crashed the minivan into a

5

mailbox and all five men fled on foot. They were subsequently apprehended.

Based on these events, Appellants were charged with conspiracy to commit carjackings, *see* 18 U.S.C.A. § 371 (West 2000); using and carrying a firearm during and in relation to a crime of violence (the carjacking conspiracy), *see* 18 U.S.C.A. § 924(c)(1) (West 2000); causing death by use of a firearm during the course of the § 924(c) offense, *see* 18 U.S.C.A. § 924(j) (West 2000); three counts of carjacking and one count of attempted carjacking, *see* 18 U.S.C.A. § 2119 (West 2000); and four counts of using and carrying a firearm during a crime of violence (the substantive carjacking offenses), *see* 18 U.S.C.A. § 924(c)(1). Following a jury trial, Appellants were convicted of all charges. Both were sentenced to life imprisonment.

## II.

Appellants' primary contention on appeal is that venue on the § 924(j) count was improper in the District of Maryland. Appellants maintain that because the carjacking and murder of Matthew Dozier took place solely in the District of Columbia, venue was proper only in that jurisdiction. We hold that the logic of *United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999), compels the conclusion that venue on the § 924(j) count was proper in the District of Maryland.

Article III of the Constitution provides, as is relevant here, that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. The Sixth Amendment reinforces this command, stating that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI; *see* Fed. R. Crim. P. 18 ("Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed."). When multiple counts are alleged in an indictment, venue must be proper on each count. *See United States v. Bowens*, 224 F.3d 302, 308 (4th Cir. 2000), *cert. denied*, 121 S. Ct. 1408 (2001). Venue on a count is proper only in a district in

which

an essential conduct element of the offense took place. *See id.* at 309.

The burden is on the Government to prove venue by a preponderance

6

of the evidence. *See United States v. Barsanti*, 943 F.2d 428, 434 (4th Cir. 1991).

In order to understand Appellants' venue challenge and our resolution of that challenge, it is necessary to examine the first three counts of the indictment against Appellants. Count One of the indictment charged Appellants with conspiracy to commit carjackings; this count identified all of the carjackings and the murder of Dozier as overt acts in furtherance of the conspiracy. Count Two charged Appellants with using and carrying a firearm during and in relation to a crime of violence, namely, the conspiracy to commit carjackings "as set forth in Count One of this Indictment." Supp. J.A. 5. Count Three, the § 924(j) count, charged Appellants with causing the death of a person through the use of a firearm "in the course of the violation of 18 U.S.C. § 924(c) as set forth in Count Two of this Indictment." *Id.* at 6.

In determining where a crime was committed for purposes of venue, "a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *Rodriguez-Moreno*, 526 U.S. at 279; *see United States v. Anderson*, 328 U.S. 699, 703 (1946). Section 924(j) applies to "[a] person who, in the course of a violation of [§ 924(c)], causes the death of a person through the use of a firearm." 18 U.S.C.A. § 924(j). Thus, the conduct elements of a § 924(j) violation are (1) the use of a firearm to cause the death of a person and (2) the commission of a § 924(c) violation. The conduct elements of the § 924(c) violation, in turn, are (a) the use of a firearm and (b) the commission of a crime of violence. *See Rodriguez-Moreno*, 526 U.S. at 280.

In *Rodriguez-Moreno*, the Court addressed the question of the proper venue for a charge of using or carrying a firearm during a crime of violence, kidnaping, under § 924(c)(1). The defendant kidnaped the victim in Texas and subsequently took him to New Jersey, New York, and Maryland. *See id.* at 276-77. While in Maryland, the defendant obtained a gun and threatened the victim with it. *See id.* at 277. The defendant was subsequently convicted in the

District of New Jersey of kidnaping and violating § 924(c)(1). *See id.* The Supreme Court rejected the defendant's argument that venue on the latter count

7

was improper in New Jersey because the use of the firearm occurred only in Maryland. The Court reasoned that in § 924(c)(1), "Congress proscribed both the use of the firearm *and* the commission of acts that constitute a violent crime" and that when the underlying crime of violence is a continuing offense that may be prosecuted in more than one jurisdiction, the related § 924(c)(1) charge is also a continuing offense. *Id.* at 281. Thus, the Court concluded that venue on the § 924(c)(1) offense was proper in any jurisdiction in which the underlying crime of violence may be prosecuted. *See id.* at 281-82.

The logic of *Rodriguez-Moreno* compels us to conclude that venue on the § 924(j) count was proper in the District of Maryland. The relevant conduct elements of the crime alleged in Count Three of the indictment were that Appellants caused the death of Matthew Dozier through the use of a firearm during the course of violating § 924(c)(1), *i.e.*, while using or carrying a firearm during a conspiracy to commit carjackings. Under the logic of *Rodriguez-Moreno*, because conspiracy to commit carjackings is a continuing offense, *see United States v. Meitinger*, 901 F.2d 27, 28 (4th Cir. 1990), so too is the § 924(c)(1) violation alleged in Count Two of the indictment. And, because the continuing § 924(c)(1) violation underlies the § 924(j) charge and is a necessary conduct element of that charge, venue on the § 924(j) count was proper in any jurisdiction where the § 924(c)(1) count could have been prosecuted. Since venue on the § 924(c)(1) count was undisputedly proper in the District of Maryland, the district court did not err in denying Appellants' motion to dismiss the § 924(j) count for improper venue.

### III.

During the course of the investigation, law enforcement officers executed search warrants at Robinson's and Obanion's homes. The applications for the warrants were supported by an affidavit by Special Agent Michael McCoy of the FBI.[1] McCoy's affidavit stated that he was involved in a joint federal-state investigation of "a racketeering enterprise responsible for the distribution of narcotics and the commission of numerous violent crimes to include murders, assaults

[1] McCoy submitted the same affidavit in support of both search warrants.

8

with intent to murder, armed carjackings, and armed robberies." J.A. 41. The affidavit set forth allegations regarding the carjackings and murder of Matthew Dozier, as well as numerous other violent crimes committed by members of the self-titled "Fort Washington Crew," *id.* at 43, which was alleged to consist of Appellants, the Erbys, Maxwell, and others. In conclusion, McCoy attested that the crimes described in the affidavit "are racketeering acts [as] defined in Title 18 U.S.C. Section 1961" and that "the combination of these acts committed by this group constitutes participating in the affairs of an enterprise, the activity of which affects interstate commerce through a pattern of racketeering." *Id.* at 46. Attachment A to the affidavit identified particular items to be seized during the search, including items of clothing worn during the carjackings and items taken from Corporal Landers' patrol car and from the victims of the carjackings. Attachment A also identified as items to be seized "[b]ooks, ledgers, journals, notations, letters, photographs, graffiti, news articles, telephone books and other items of evidentiary value." *Id.* at 48.

Prior to trial, Appellants moved to suppress the fruits of the searches. As to both searches, Appellants maintained that the search warrants were not supported by probable cause. As to the search of Obanion's home in particular, Appellants maintained that the searching officers flagrantly disregarded the terms of the warrant and that the appropriate remedy for this violation was blanket suppression of all items seized. The district court denied the motion to suppress. In considering Appellants' challenge to the validity of the warrants, we review the legal conclusions of the district court de novo and its factual findings for clear error. *See United States v. Photogrammetric Data Servs., Inc.*, 259 F.3d 229, 237 (4th Cir. 2001). We review the denial of the request for blanket suppression for abuse of discretion. *See United States v. Borromeo*, 954 F.2d 245, 246 (4th Cir. 1992).

## A.

The Fourth Amendment provides in pertinent part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated, and
no Warrants shall issue, but upon probable cause." U.S. Const.
amend. IV. "This fundamental right is preserved by a requirement that
searches be conducted pursuant to a warrant issued by an independent

9

judicial officer." *California v. Carney*, 471 U.S. 386, 390 (1985).

Although we review de novo the denial of the motion to suppress by the district court, the determination of probable cause by the issuing magistrate is entitled to great deference from this court. *See United States v. Wilhelm*, 80 F.3d 116, 118-19 (4th Cir. 1996).

As the Supreme Court has noted, "probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). In evaluating whether probable cause exists, it is the task of the issuing magistrate "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238; *see Mason v. Godinez*, 47 F.3d 852, 855 (7th Cir. 1995) ("Probable cause means more than bare suspicion but less than absolute certainty that a search will be fruitful."). The probable cause standard does not

> require officials to possess an airtight case before taking
> action. The pieces of an investigative puzzle will often fail
> to neatly fit, and officers must be given leeway to draw rea-
> sonable conclusions from confusing and contradictory infor-
> mation, free of the apprehension that every mistaken search
> or seizure will present a triable issue of probable cause.

*Taylor v. Farmer*, 13 F.3d 117, 121-22 (4th Cir. 1993). Indeed, the Supreme Court in *Gates* specifically cautioned against "hypertechni-cal" scrutiny of affidavits lest police officers be encouraged to forgo the warrant application process altogether. *Gates*, 462 U.S. at 236 (internal quotation marks omitted).

Appellants' first argument regarding the existence of probable cause is that the affidavit failed to set forth any facts tying them to the carjackings or to the racketeering enterprise alleged in the affida-vit. We disagree. Even if the affidavit was not a model of precision, it was nevertheless constitutionally adequate. First, McCoy's affidavit informed the magistrate that Obanion's fingerprints had

been found
in the carjacked Maxima and in Landers' patrol car.
Additionally, the
affidavit stated that the Erbys and Maxwell had provided
investigat-

10

ing officers with information regarding the involvement of themselves and Appellants in the carjackings and various other crimes alleged to be involved in the racketeering enterprise.

In the same vein, Appellants maintain that the affidavit does not provide any facts to support a conclusion that evidence of racketeering or any other crime would be found in the Robinson or Obanion homes. We reject this contention as well. The affidavit and Attachment A identified specific items of clothing worn by Appellants and specific items taken during the various carjackings and robberies. Additionally, McCoy attested that in his experience many perpetrators of criminal acts do not dispose of the clothing worn during the crime. McCoy's personal experience was unquestionably relevant to the existence of probable cause. *See United States v. Faison*, 195 F.3d 890, 893 (7th Cir. 1999). These facts, taken together, are sufficient to create a fair probability that evidence of the crimes would be located in Robinson's and Obanion's homes.[2]

### B.

During the search of Obanion's home, law enforcement officers seized a number of items that were arguably not within the scope of the search warrant. For example, the officers seized various documents related to a dispute between Obanion, his mother, and the Prince George's County school board; some of Obanion's juvenile court records; pages of homework; and a list of names and addresses for a family reunion. Appellants argue that the seizure of these and other items constituted a flagrant disregard of the terms of the warrant

_____

[2] Appellants also argue that the affidavit did not set forth probable cause to believe that Appellants had engaged, or were engaged, in the crime of racketeering. Having reviewed the affidavit, we conclude that it did set forth probable cause to believe that Appellants were guilty of racketeering.

In light of our conclusion that the search warrants were based upon probable cause, we do not address the Government's alternative contention that the searches were sustainable under the "good faith" exception

to the warrant requirement. *See United States v. Leon*, 468 U.S. 897, 913 (1984).

11

justifying blanket suppression of all items seized, including those that
were within the scope of the warrant.

In order to be valid under the Fourth Amendment, a search warrant
must, *inter alia*, "particularly describ[e] the place to be searched, and
the persons or things to be seized." U.S. Const. amend. IV. The pur-
pose of this particularity requirement is to avoid "a general, explor-
atory rummaging in a person's belongings." *Andresen v. Maryland*,
427 U.S. 463, 480 (1976) (internal quotation marks omitted). *See gen-
erally Stanford v. Texas*, 379 U.S. 476, 481-85 (1965) (describing his-
tory and purpose of particularity requirement). A sufficiently
particular warrant describes the items to be seized in such a manner
that it leaves nothing to the discretion of the officer executing the
warrant. *See Marron v. United States*, 275 U.S. 192, 196 (1927).

A search is not invalidated in its entirety merely because some
seized items were not identified in the warrant. *See United States v.
Hargus*, 128 F.3d 1358, 1363 (10th Cir. 1997). Rather, invalidation
of an entire search based on a seizure of items not named in the war-
rant is an "extraordinary remedy" that "should be used only when the
violations of the warrant's requirements are so extreme that the search
is essentially transformed into an impermissible general search."
*United States v. Chen*, 979 F.2d 714, 717 (9th Cir. 1992). Put another
way, searching officers may be said to have flagrantly disregarded the
terms of a warrant when they engage in "indiscriminate fishing" for
evidence. *Id.* For example, the Tenth Circuit affirmed a finding of fla-
grant disregard when law enforcement officers, acting pursuant to a
warrant that authorized seizure of marijuana and several specifically
identified firearms, seized "anything of value," including televisions,
VCRs, stereos, a lawn mower, cameras, a clock radio, and a screw-
driver set. *United States v. Foster*, 100 F.3d 846, 848 & n.1, 850-51
(10th Cir. 1996); *see United States v. Medlin*, 842 F.2d 1194, 1198-
99 (10th Cir. 1988) (concluding that seizure of 667 items of property
not identified in warrant authorizing search for stolen firearms consti-
tuted flagrant disregard of the terms of the warrant).

We conclude that the extraordinary remedy of blanket

suppression
is not warranted here. Simply put, the record does not demonstrate the
kind of wholesale seizure that prompted the holdings in *Foster* and
*Medlin*. In many cases, items that were not identified in the warrant

12

were seized because they were part of a larger item of evidentiary value. For example, a grocery list was seized because it was found inside a date book containing names and addresses; Obanion does not dispute that the date book was an item within the scope of the warrant. Similarly, a page of Spanish homework was seized not for the evidentiary value of the homework, but rather because the back of the page contained notations and telephone numbers relevant to the investigation. Furthermore, we note that the officers suspended the search and obtained a second warrant before seizing an item found above the ceiling tiles in Obanion's bedroom. Such scrupulous regard for the protections afforded by the Fourth Amendment belies any intent to disregard the terms of the warrant. We therefore affirm the denial of blanket suppression.

## IV.

Appellants next challenge the admission of Longshore's testimony regarding Appellants' verbal description of the murder of Matthew Dozier. Longshore testified that although she was not looking at Appellants as they described the murder and could not identify which Appellant made any given statement, she could discern two separate voices and knew that Robinson and Obanion were jointly describing the crime. Further, Longshore testified that at no point did either individual contradict or deny the other's portion of the account. The district court admitted Longshore's testimony, reasoning that to the extent statements by Robinson were admitted against Obanion and vice-versa, the statements were adoptive admissions under Federal Rule of Evidence 801(d)(2)(B), and thus were not excludable hearsay.[3]

Rule 801(d)(2)(B) provides that "[a] statement is not hearsay" if the statement is offered against a party and if the party against whom the statement is offered "has manifested an adoption [of] or belief in" the truth of the statement.

_____

[3] To the extent the statements were introduced against the Appellant who made them, they were admissible pursuant to Federal Rule of Evidence 801(d)(2)(A) (providing that a party's own statement is not hear-

say when introduced against that party).

> When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement.

*United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996). A party may manifest adoption of a statement in any number of ways, including [through] words, conduct, or silence. *See Marshall v. Young*, 833 F.2d 709, 716 n.3 (7th Cir. 1987). We review the admission of evidence by the district court for abuse of discretion. *See United States v. D'Anjou*, 16 F.3d 604, 610 (4th Cir. 1994).

Appellants maintain that because Longshore could not identify which Appellant said what, "the record does not sufficiently show that either [Appellant] heard, understood, or acquiesced in the statements of the other." Appellants' Br. at 46. We disagree. In the first place, while Longshore testified that both Appellants participated in telling the story of the murder, she did not state that their voices were jumbled together in such a way as to prevent her or each Appellant from hearing and understanding what was being said. We therefore conclude that the circumstances were such that, had either Appellant disagreed with a statement by the other, he would have made his disagreement known. Moreover, the scenario described by Longshore, in which both Appellants provided parts of the tale, contained ample facts from which a jury could conclude that each Appellant adopted the statements of the other.

## V.

Finally, Robinson maintains that he is entitled to reversal of his § 924(j) conviction under *United States v. Boone*, 245 F.3d 352 (4th Cir. 2001). In *Boone*, a panel of this court held that a defendant charged with a death-eligible crime is entitled, under 18 U.S.C.A. § 3005 (West 2000), to representation by two attorneys regardless of whether the Government actually seeks the death penalty. *See Boone*,

245 F.3d at 358. In light of that holding, Boone's conviction was
vacated. *See id.* at 364.

14

Because Robinson did not object to the asserted violation of § 3005, our review is for plain error.[4] *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731-32 (1993). In order to demonstrate plain error, Robinson must show that an error occurred, that the error was plain, and that the error affected his substantial rights. *See Olano*, 507 U.S. at 732; *United States v. Jackson*, 124 F.3d 607, 614 (4th Cir. 1997). Even if Robinson can satisfy these requirements, correction of the error remains within our discretion, which we "should not exercise . . . unless the error `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 732 (second alteration in original) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)).

Applying *Boone* — as we must, *see Baker v. Corcoran*, 220 F.3d 276, 290 n.11 (4th Cir. 2000), *cert. denied*, 121 S. Ct. 1194 (2001) — we conclude that Robinson has satisfied the first three prongs of plain error analysis. While Robinson was provided with two attorneys during pretrial proceedings, one of those attorneys was relieved of his duties after the Government elected not to seek the death penalty against Robinson. Under *Boone*, the failure to provide Robinson with two attorneys throughout trial was plain error even though the Government withdrew its notice of intent to seek the death penalty. Moreover, because a violation of § 3005 is not reviewable for harmlessness, *see Boone*, 245 F.3d at 361 n.8, the error necessarily affected Robinson's substantial rights, *see United States v. David*, 83 F.3d 638, 647 (4th Cir. 1996).

We decline, however, to exercise our discretion to notice the error. Simply put, the error here — the failure to provide a *non-capital* defendant with the benefit of a provision designed to provide addi-

---

[4] Robinson asserts that plain error review does not apply because a violation of § 3005 is a structural defect. We disagree. Even if a violation of § 3005 is a structural defect, *cf. Boone*, 245 F.3d at 361 n.8 (noting that a violation of § 3005 is not amenable to harmless-error analysis), it is well settled in this circuit that plain error review applies to forfeited structural errors. *See, e.g.*, *United States v. David*, 83 F.3d

638, 647-48
(4th Cir. 1996) (applying plain error analysis to forfeited structural
error).

tional protection to *capital* defendants—did not affect the fairness,
integrity, or public reputation of judicial proceedings.[5]

VI.

For the reasons set forth above, we conclude that none of Appel-
lants' challenges to their convictions have merit. Accordingly, we
affirm.

*AFFIRMED*

---

[5] To the extent that § 3005 benefits even non-capital defendants during
the period when the Government is deciding whether to seek the death
penalty, *see Boone*, 245 F.3d at 360, Robinson received that benefit.

16