<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 07-4775**

———————————

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

WALTER BABB, a/k/a B, a/k/a Brian, a/k/a WB,

        Defendant - Appellant.

———————————

**No. 07-4776**

———————————

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

JAMES MOORE, a/k/a Duffy, a/k/a Fat James,

        Defendant - Appellant.

———————————

Appeals from the United States District Court for the District
of Maryland, at Baltimore.   Andre M. Davis, District Judge.
(1:04-cr-00190-AMD)

———————————

Argued: January 28, 2010        Decided: March 15, 2010

———————————

Before TRAXLER, Chief Judge, and KING and GREGORY, Circuit
Judges.

———————————

Affirmed by unpublished opinion. Judge Gregory wrote the opinion, in which Chief Judge Traxler and Judge King joined.

---

**ARGUED:** Joseph Murtha, MILLER, MURTHA & PSORAS, LLC, Lutherville, Maryland; William Collins Brennan, Jr., BRENNAN, SULLIVAN & MCKENNA, LLP, Greenbelt, Maryland, for Appellants. John Francis Purcell, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** William A. Mitchell, Jr., BRENNAN, SULLIVAN & MCKENNA, LLP, Greenbelt, Maryland, for Appellant Walter Babb. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

James Moore and Walter Babb were convicted in the United States District Court for the District of Maryland for their participation in a large drug conspiracy which involved the use of firearms. On appeal, they jointly argue that the district court erred in refusing to give multiple conspiracies and reasonable doubt instructions, the District of Maryland was not the proper venue for the prosecution of one of the firearms offenses, and the district court should have conducted voir dire to determine whether jurors had been intimidated by spectator conduct.[1] Because we find none of petitioners' arguments persuasive, we affirm both Babb and Moore's convictions in their entirety.

---

[1] James Moore sought, and we granted, permission to file a pro se supplemental brief after this case was calendared for oral argument. In it he raises arguments concerning speedy trial, double jeopardy, and failure to indict on conduct used as other acts evidence at sentencing. Because settled circuit precedent controls on these issues, see United States v. Keith, 42 F.3d 234, 238-39 (4th Cir. 1994) (holding that where a defendant acquiesces in a continuance, that time is excluded from the speedy trial calculation), United States v. Camps, 32 F.3d 102, 106 (4th Cir. 1994) (holding that multiple sentences for offenses under 18 U.S.C. § 924(c) are appropriate when multiple, separate acts of firearm use have occurred even if they are related to the same underlying offense), and United States v. Grubbs, 585 F.3d 793, 798-99 (4th Cir. 2009) (citing United States v. Watts, 519 U.S. 148, 157 (1997)) (holding that uncharged conduct may be considered at sentencing when that conduct is proven by a preponderance of the evidence) respectively, we decline to address these issues further and find the district court did not err on those grounds.

During the mid-1990s, Richard Jackson ("Jackson") began selling cocaine in the Danville, Virginia area. Beginning in 1999 or 2000, Willie Robinson ("Robinson"), a friend of Jackson's from when they both lived in New Rochelle, New York but who now resided in Danville, began buying cocaine from Robinson. Jackson sold the cocaine to Robinson in powder form and then taught Robinson how to "cook" it into crack for sale. By January 2003, Robinson was buying approximately one kilogram of cocaine per week from Jackson.

Jackson met Walter Babb ("Babb") in 1996 or 1997 in North Carolina. Babb purchased cocaine from Jackson from 1996 until Babb was incarcerated. When he was released in 2000, Jackson again became his supplier. In the spring of 2002, Babb regularly bought several ounces of crack from Jackson a couple times a week for his own distribution. Adrian Williamson ("Williamson") then sold the crack for Babb. Babb continued to buy from Jackson until Jackson was arrested for drug trafficking offenses in January 2003. At that time, Babb owed Jackson about $12,000 for crack sold on consignment, and Jackson, from jail, arranged for Robinson to collect payment from Babb. Even though Jackson had been a source of their cocaine, Babb and Williamson continued to distribute crack in the Greensboro area after Jackson's arrest.

Walter Moore ("Moore") was also from New Rochelle and was involved in drug trafficking with Robinson before Robinson moved to North Carolina. When Moore subsequently moved to Andrews, South Carolina, he contacted Robinson again, offering to connect him with a source for cheaper cocaine so that Robinson could continue his drug trafficking operations after Jackson's arrest. To this end, Moore traveled to El Paso, Texas in August of 2003. While there, he attempted to get a friend he met in jail, Rey Sanchez ("Sanchez"), to give him several kilograms of cocaine on consignment. However, Sanchez refused to front any drugs, and Moore returned home after a week. During this time, Moore made several telephone calls from Sanchez's body shop in El Paso to his longtime girlfriend, Davita Bush ("Bush"), the records of which were admitted at trial.

In October 2003, Moore again attempted to secure cocaine from Mexico and traveled to El Paso for three weeks. This time he went with Robinson to broker a deal between Robinson and Sanchez, though Moore complained to Bush during a phone call that Robinson was being greedy. Babb also accompanied them, and sent money via Western Union to Bush, the record of which was admitted at trial. While Babb was in Mexico, Porsha Harper ("Harper"), one of his girlfriends, looked after his apartment. Harper met Babb in 2001 in Greensboro, and they had an on-again-off-again relationship. In October 2003, Babb called her and

5

asked her to check on his house and do his laundry while he was away, which she did. In late October when Moore, Babb and Robinson returned to Greensboro, Moore stayed with Babb in his apartment. That was the first time Harper met Moore, and they became friends.

On November 5, 2003, Moore asked Harper if she would drive him to New York, and she agreed. Very early the next morning, Moore and Babb arrived at Harper's house driving a Dodge Intrepid. Harper had seen the Intrepid before and knew that Babb used in his drug business, so she asked Babb if there were drugs in the car. He said no. Babb also told her that something had come up and that he was no longer going to be going on the trip to New York. Harper then left with Moore and drove for several hours until they entered Maryland, then Moore took over driving. During the drive, Moore told her that he was the "connect" on a drug deal with Babb in Mexico. He also told her there was $300,000 in the car.

At approximately 10:28 a.m. that day, Moore and Harper were stopped by Trooper Cameron, a Maryland State Police Officer, for a speeding violation while traveling on Interstate 95. Moore was unable to produce any identification or a driver's license, and he and Harper gave conflicting stories. Trooper Cameron noticed that the trunk of the car was riding low and asked Harper about it. She stated the trunk was full of clothing and

6

offered to show him.  Harper got the keys from inside the car, walked to the trunk, and opened it.  Trooper Cameron and the backup officers he had called saw two dead bodies wrapped in blankets and garbage bags laying in the trunk.  Harper immediately noticed that the blankets the bodies were wrapped in were the same blankets she had previously laundered at Babb's house.

Harper and Moore were arrested.  Moore waived his Miranda rights and spoke with police.  He told them he was running drugs for Rey Sanchez and that he had hundreds of thousands of dollars in the car.  He denied knowledge of the bodies.  The victims were identified as Robinson and Alexandria Withers, another participant in the drug conspiracy.  Both had been shot multiple times at close range.  Upon forensic examination, Moore's fingerprints were on the garbage bags the victims were wrapped in.[2]

After Moore was arrested, Babb spoke with Bush via telephone and started sending her significant amounts of money via Western Union.  Bush in turn arranged three-way phone calls between Moore in jail and Babb.  During these calls, Moore and Babb arranged for payments to Bush, as well as for her to come

_____

[2] There was myriad other evidence concerning the murders presented at trial that is not pertinent for the questions before this Court.

to Greensboro to get drugs for sale from Babb. She traveled to Greensboro in early 2004 and received 200 grams of crack cocaine from Babb. In another visit she received crack and cocaine powder. Bush was arrested on July 14, 2004, for her involvement in the drug trafficking scheme.

On June 9, 2004, a search warrant was executed on Babb's former apartment, which was uninhabited after he had moved out. The police found evidence of bloodstains on the carpet and elsewhere in the apartment. On August 17, 2004, Babb was arrested in Greensboro. His current residence was searched, and two assault rifles were recovered from a crawl space in the ceiling right next to the door. A Taurus forty-five caliber handgun was recovered from the insulation, and other guns were found in a bag in the attic.

Babb and Moore were charged in the District of Maryland in a seven-count indictment with: Count One conspiracy to possess with intent to distribute five kilograms or more of cocaine base in violation of 21 U.S.C. § 841(a)(1); Count Two conspiracy to carry and use firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(o); Count Three knowingly carrying and discharging a firearm against Willie Robinson in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c); Count Four knowingly using and discharging a firearm against Alexandria Withers in relation to

8

a drug trafficking crime in violation of 18 U.S.C. § 924(c); Count Five causing the death of Willie Robinson by discharging a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(i); Count Six causing the death of Alexandria Withers by discharging a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(i); and Count Seven knowingly possessing firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c).

At trial, the United States dismissed Counts Five and Six of the indictment at the close of evidence. The jury found Moore guilty of Counts One, Two, Three, Four and Seven. He was sentenced to life on Count One, 240 months on Count Two, 120 months on Count Three, 120 months on Count Four, and 300 months on Count Seven. The jury failed to reach a verdict on Counts Three and Four as to Babb, and convicted him of Counts One, Two and Seven. Babb was sentenced to life on Count One, twenty years on Count Two, and sixty months on Count Seven. This appeal followed.

## II.

On appeal, Babb and Moore raise questions concerning the jury instructions given at trial, venue, and jury intimidation. We address each of these issues in turn.

A.

A district court's denial of a requested jury instruction is reviewed by this Court for abuse of discretion. United States v. Romer, 148 F.3d 359, 367 (4th Cir. 1996). Babb and Moore argue that the district court erred in failing to give both a multiple conspiracies instruction and a reasonable doubt instruction. We disagree.

1.

Babb and Moore first argue that the district court erred in failing to give a multiple conspiracies instruction when they requested it. They contend that there was no overarching conspiracy between them, just individual drug conspiracies, and even if they did conspire together, the evidence supports a finding that the conspiracy began in October 2003, and not earlier as charged. However, sufficient evidence exists to demonstrate that their drug trafficking activities were related and, thus a multiple conspiracies instruction was not warranted.

A district court need not instruct on multiple conspiracies each time a defendant requests it. Rather, "[a] court need only instruct on multiple conspiracies if such an instruction is supported by the facts." United States v. Mills, 995 F.2d 480, 485 (4th Cir. 1993). Thus, "[a] multiple conspiracy instruction is not required unless the proof at trial demonstrates that appellants were involved only in 'separate conspiracies

10

unrelated to the overall conspiracy charged in the indictment.'" United States v. Kennedy, 32 F.3d 876, 884 (4th Cir. 1994) (quoting United States v. Castaneda-Cantu, 20 F.3d 1325, 1333 (5th Cir. 1994)). Furthermore, even if one overarching conspiracy is not apparent, failure to give a multiple conspiracies instruction is reversible error only when it causes substantial prejudice to the defendant. United States v. Tipton, 90 F.3d 861, 883 (4th Cir. 1996). To find such prejudice, "the evidence of multiple conspiracies [must have been] so strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction." Id.

This Circuit has addressed several other large drug conspiracies where both the participants and the level of their involvement evolved during the time charged. In United States v. Tipton, 90 F.3d 861 (4th Cir. 1996), the drug conspiracy charged began in New York and moved to Richmond. As a consequence, the leadership changed over time, and new participants entered and left the conspiracy. The Court held that no multiple conspiracy instruction was due in that case, even for the participant who joined shortly before the conspiracy was interrupted by arrests, because the evidence

11

demonstrated one enduring conspiracy dedicated to distributing drugs.  Id. at 882-83.

Similarly in United States v. Banks, 10 F.3d 1044 (4th Cir. 1993), the coconspirators charged were cocaine suppliers and distributors in the Tidewater Virginia area.  Even though the dealers were actually in competition with one another, this Court held they were all properly joined in one conspiracy because they had the same goal of creating a large cocaine market in the area.  Id. at 1054.  The Court further held that "one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence."  Id.

These cases show that drug conspiracies, though they may have shifting membership, are one unit of prosecution when they have a common unifying goal.  The evidence presented in this case demonstrates a single drug conspiracy during the time charged in the indictment.  At the time the indictment charged as the beginning of the conspiracy, there was a well-established conspiracy involving Jackson, Robinson, Babb and Williamson. Jackson would sell powder cocaine to Robinson who would then cook it into crack.  Babb would buy crack from Jackson, and then Williamson would sell it.  This pattern of the conspiracy continued until Jackson was arrested in January 2003.  At that

12

time, Babb repaid the debt he owed to Jackson by giving it to Robinson.  Babb and Williamson then continued their distribution activities.  Meanwhile, Robinson reestablished contact with an old friend from New York, Moore, who promised to help him secure a replacement, cheaper source for cocaine.  As a result, Moore traveled twice to El Paso, once alone and once with Babb and Robinson, in order to secure the cocaine.  Moore was arrested on November 6, 2003 after Robinson was murdered, but he continued communicating with Babb and Bush to arrange for funds originating from the drug conspiracy to be transferred to Bush and for her to receive cocaine for sale.  Bush was arrested in July of 2004, and finally Babb was arrested in August of 2004.  Several firearms and a drug scale were found at his house.

Given the evidence enumerated above, there was sufficient evidence for a reasonable jury to determine that there was one continuous conspiracy.  Williamson and Babb continued their distribution activities after Jackson's arrest, while Robinson and Moore planned to secure another source of cocaine.  That they shared the same goal is manifested by their joint trip to El Paso with the purpose of securing cocaine from Sanchez. Therefore, the evidence does not compel the conclusion that there were two separate conspiracies.  Moore and Babb thus cannot demonstrate that the jury would have acquitted as to the conspiracy count if they had been given the cautionary multiple

13

conspiracies instruction, and we find no prejudice to the defendants and hold that the district court did not abuse its discretion denying such an instruction.

2.

With regard to the question of whether a reasonable doubt instruction was required when requested by the defendants, this Court is bound by both Supreme Court and Circuit precedent directly contrary to the appellants' contention. This Court held in United States v. Oriakhi, that no reasonable doubt instruction is constitutionally required, unless the jury requests it. 57 F.3d 1290, 1300 (4th Cir. 1995). Further, the Supreme Court held in Victor v. Nebraska that "the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." 511 U.S. 1, 5 (1994). There has been no subsequent decision which would lead this Court to rethink its precedent that "the words 'beyond a reasonable doubt' have the meaning generally understood for them and that further efforts to restate their meaning with different words tend either to alter or to obfuscate that meaning." Oriakhi, 57 F.3d at 1300.

B.

The second issue Moore and Babb raise on appeal concerns venue. As venue is a legal question, this Court reviews the decision of the district court de novo. United States v.

14

Wilson, 262 F.3d 305, 320 (4th Cir. 2001). Moore and Babb argue that venue for the 924(c) offense charged in Count Seven was improper in the District of Maryland because the conspiracy had ceased at the time the firearms were seized from Babb's home, and thus no element of those offenses occurred in Maryland. This claim relates to their unsuccessful multiple conspiracies argument above and is similarly unavailing.

1.

Article III of the Constitution provides, as is relevant here, that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. The Sixth Amendment reinforces this command, stating that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI; see Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). When multiple counts are alleged in an indictment, venue must be proper on each count. See United States v. Bowens, 224 F.3d 302, 308 (4th Cir. 2000). Venue on a count is proper only in a district in which an essential conduct element of the offense took place. Id. at 309. The burden is on the government to prove venue by a preponderance of the

evidence.  See United States v. Barsanti, 943 F.2d 428, 434 (4th Cir. 1991).

For episodic crimes, venue is proper in the district where an essential element of the crime occurred.  In continuing crimes, such as conspiracy, venue is proper in the location of any of the criminal acts.  United States v. Rodriguez-Moreno, 526 U.S. 275, 279, 282 (1999).  Further, in continuing offenses that are based upon some underlying criminal offense, venue for the continuing offense is proper in any district where venue lies for the underlying offense.  United States v. Robinson, 275 F.3d 371, 379 (4th Cir. 2001).  In Robinson, this Court held that where the defendant was charged with a violation of 18 U.S.C. § 924(j) (causing the death of a person during and in relation to a crime of violence) he could be charged in any district in which the underlying offense, a violation of 18 U.S.C. § 924(c), could have been prosecuted.  Id. at 378. Additionally, and most important for this case, in Rodriguez-Moreno, the Supreme Court held that for charges of a violation of 18 U.S.C. § 924(c), venue for the weapons charge is proper anywhere the underlying crime of violence or drug crime could be prosecuted.  526 U.S. at 281-82.

2.

Thus, whether venue was proper for the section 924(c) violation charged in Count Seven depends on whether an overt act

16

occurred in Maryland.  Babb and Moore argue that the conspiracy had been terminated by the arrests of Moore, Babb, and Bush at the time the weapons were seized.  However, because there was no termination of the conspiracy and an overt act occurred in Maryland, venue was proper there.

A conspiracy is not terminated merely because its participants are arrested.  United States v. Urrego-Linares, 879 F.2d 1234, 1240 (4th Cir. 1989).  Even if substantial time has passed between the formation of the conspiracy and the last overt act, the conspiracy has not necessarily ended.  Joyner v. United States, 547 F.2d 1199, 1203 (4th Cir. 1977) (holding that the end of a conspiracy must be "affirmatively shown"). Instead, the defendant bears the burden to show that the conspiracy terminated when "the former coconspirator acted to defeat or disavow the purposes of the conspiracy."  United States v. Urbanik, 801 F.2d 692, 697 (4th Cir. 1986).  Mere withdrawal is not enough.

Here, even though Bush had been arrested a month before the weapons were seized and there was no evidence of contact between Babb and Moore, the conspiracy had not terminated.  The weapons and drug scale found inside Babb's home are evidence that the conspiracy was ongoing, with Babb as its source outside of jail. The defendants presented no evidence which suggests termination other than the arrests, and there was no evidence of disavowal.

17

Therefore, there was sufficient evidence for the jury to conclude that the possession of the weapons was in furtherance of the drug trafficking conspiracy.

The conspiracy also had an overt act in the District of Maryland, which Babb and Moore concede in their brief. They acknowledge that venue was proper in Maryland for the substantive drug traffic charge in Count One. Venue was proper in Maryland because an overt act of the drug conspiracy, the carrying of money and bodies into the state on Interstate 95, occurred there. Therefore, under Robinson and Rodriguez-Moreno, venue for the section 924(c) counts is proper as well because those charges could be brought in any district in which the underlying drug offense had venue.

C.

Finally, for the first time on appeal, Babb and Moore argue that the district court erred in failing to voir dire the jury concerning possible juror intimidation. As they did not object at trial, this Court reviews the district court's actions for plain error. Fed. R. Crim. P. 52(b). In order to prevail under plain error review, a petitioner must demonstrate that: (1) an error occurred; (2) the error was plain; and (3) the error affected his substantial rights. United States v. Olano, 507 U.S. 725, 732 (1993). If these three elements are met, this Court may exercise its discretion to notice error only if the

18

error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. (internal quotation marks and citations omitted); see also United States v. Hughes, 401 F.3d 540, 555 (4th Cir. 2005).

1.

The defendant's right to a fair trial by an impartial jury free from the potentially prejudicial influence of third parties includes the right to have a jury free from contact by third parties. Mattox v. United States, 146 U.S. 140, 150 (1892) ("Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."). There is a presumption of prejudice to the defendant when there is "any private communication, contact, or tampering, directly or indirectly with a juror during trial about the matter pending before the jury." Remmer v. United States, 347 U.S. 227, 229 (1954). However, this presumption only arises when the defendant establishes that extra-judicial contacts occurred which cast doubt on the validity of the jury's verdict. Stockton v. Virginia, 852 F.2d 740, 747 (4th Cir. 1988). The only case where this prejudice was said to arise because of intimidation in the courtroom was in the Ninth Circuit's decision in United States v. Rutherford, 371 F.3d 634 (9th Cir.

19

2004). The court held that when the intimidation inside the courtroom was coming from the government, there was a presumption of prejudice due to the "heightened concern that the jurors will not 'feel free to exercise [their] functions' with the Government 'looking over [their] shoulder[s].'" Id. at 643 (quoting Remmer, 347 U.S. at 229).

Further, even if improper influence is suggested, there is no requirement that the court conduct individualized voir dire each time. The Seventh Circuit has held that individual questioning, which may tend to unsettle the jury, is only warranted in cases where there is a strong indication of bias or irregularity. United States v. Stafford, 136 F.3d 1109, 1112-13 (7th Cir. 1998.)

2.

In this case, the conduct complained of was not mentioned by defense counsel, but rather the district court, and as a result this Court has very little information on what the improper influence could have been. The evidence of any bias comes in the form of this brief statement by the district judge outside of the presence of the jury and spectators:

> Be seated. Counsel, there have been some regular attendees at this trial who I take it are family members, acquaintances of one or both of the defendants. It would appear that perhaps jurors believe too much attention is being paid to them. It's a rather unusual circumstance, but I've heard it before. Obviously, it's not unusual for participants

20

in a trial to watch the jury, but we want to be sure that the jury is not made uncomfortable.

So if I'm correct that the regular attendees have been members of the family or friends of the defendants, I would appreciate counsel commenting to them when and as appropriate that we don't want to make the jurors uncomfortable, and what's actually a lot more interesting about a trial is what goes on in the well of the court and from the witness stand as opposed to the jury. So I share that with you just so you can convey the court's mild concern that the jurors not be made uncomfortable. It's nothing more than that. Okay?

J.A. 915-16. There was no evidence that the judge had been notified by the jury that they were uncomfortable or whether he noticed it on his own.

On this evidence alone, the defendant has certainly not carried his burden of showing that the jury was improperly influenced, much less that the influence was so serious that it required individual voir dire by the judge.

## III.

For the foregoing reasons, both Babb and Moore's convictions are

AFFIRMED.

21