UNITED STATES of America,

v.

Amy L. LAFFERTY, a/k/a Amy L. Lowery, Defendant.

No. CRIM. 04–07–02J.

United States District Court, W.D. Pennsylvania.

June 6, 2005.

John J. Valkovci, Jr., United States Attorney's Office, Johnstown, PA, for Plaintiff.

Marketa Sims, Federal Public Defender's Office, Pittsburgh, PA, for Defendant.

### MEMORANDUM OPINION and ORDER OF COURT

GIBSON, District Judge.

This matter comes before the Court on four motions of the Defendant: Motion for Severance of Defendants with Citation of Authority (Document No. 29), Motion to Suppress Statements with Citation of Authority (Document No. 30), Motion to

Produce Evidence which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 with Citation of Authority (Document No. 31) and Motion for Discovery of Taped Statement with Citation of Authority (Document No. 32). The Court has been informed that the Government will provide the taped statement sought in the latter discovery motion, and therefore, the Court finds that this motion is moot. The Court also notes that the co-defendant in this matter, David W. Mitchell, has plead guilty and has been sentenced subsequent to the filing of Defendant Amy L. Lafferty's (Defendant) Motion for Severance and, therefore, that motion has been rendered moot as well. Therefore, the Court must resolve only two of the four original motions filed by the Defendant.[1] The Court will first analyze the Motion to Suppress and then proceed to analyze the Motion to Produce Evidence.

The Defendant has been indicted for a violation of 18 U.S.C. § 922(u) and § 924(i)(1) and (2).[2] It is alleged that the Defendant along with her co-defendant burglarized a federally licensed firearms dealer in order to trade the stolen weapons from the burglary for illegal substances, including heroin, for their personal use.

## I. *MOTION TO SUPPRESS STATE-MENTS WITH CITATION OF AU-THORITY*

It is noted that the Court held a hearing at which testimony was received in regard to the Motion to Suppress on January 31, 2005. The Court's findings of fact are based upon the testimony and exhibits admitted in that Federal Rule of Criminal Procedure 12(b)(3)(C) hearing.

## A. FOURTH AND FIFTH AMEND-MENT RIGHTS

The Court sets forth the following findings of fact and conclusions of law in order to resolve the Fourth and Fifth Amendment issues raised by the Defendant.

### *FINDINGS OF FACT*

### THE JANUARY 10, 2003 INTERVIEW OF THE DEFENDANT

1. On January 10, 2003, the Defendant along with her co-defendant, David W. Mitchell, ("Mitchell") were contacted by telephone by Special Agent Mark Willgohs ("Willgohs") of the Bureau of Alcohol Tobacco and Firearms ("ATF") and were requested to be interviewed by Willgohs at the Pennsylvania State Police Barracks in Somerset, Pennsylvania ("Barracks") regarding "an incident"; both the Defendant and Mitchell voluntarily agreed to come to the Barracks and be interviewed.

2. Mitchell and the Defendant were driven to the Barracks by Mitchell's mother and step-father.

3. On January 10, 2003, beginning at approximately 12:30 P.M., the Defendant was interviewed by both Willgohs and Pennsylvania State Trooper Ed Thomas ("Thomas"); Mitchell was interviewed separately in another office by different law enforcement officers.

1. The Court will review the Motion for Severance for the purpose of understanding the parties' arguments concerning the Defendant's right to confrontation under the Sixth Amendment.

2. The superseding indictment charges the Defendant with violations of 18 U.S.C. "Sections 922(u), 924(i)(1) and 2(a)." However, there is no subsection "2(a)" under section 924, only subsection "2." See Document No. 23 and 18 U.S.C. § 924.

4. Willgohs and Thomas were not in police uniforms, did not carry side-arms, did not touch the Defendant or yell and scream at her, did not use any "psychological ploys" on the Defendant, did not threaten or promise anything to the Defendant and did not handcuff the Defendant at any time during this interview.

5. Willgohs informed the Defendant at the outset of the interview that there was no warrant for the Defendant's arrest and that the authorities present had no plans to arrest her.

6. The room in which the Defendant was interviewed was eight feet by eight feet in dimension, and contained three chairs and a table at the time of the interview; the Defendant sat next to the door and the door was closed during most of the interview, but was left open slightly during the latter part of the interview.

7. The Defendant was informed at the time of this interview that she was free to leave whenever she wished.

8. The Defendant was read the "Statement of Rights" portion of an ATF Department of Treasury Waiver of Right to Remain Silent and of Right to Advice of Counsel form (Government's Exhibit No. 1) concerning which she had no questions and subsequently she signed said form at 12:50 P.M. indicating that she understood her rights; Willgohs did not read to the Defendant the "Waiver" portion of the form, which indicates that she is waiving her right to remain silent and her right to consult an attorney and have him present during questioning, but the Defendant read this portion of the waiver on her own and also signed this "Waiver".

9. Prior to the signing of this form, Willgohs indicated to the Defendant that he wanted to question her regarding the burglary of the Mountain Man Sports Shop.

10. The Defendant had not used heroin for three days; the symptoms of heroin withdrawal peak at thirty-six to seventy-two hours after use.

11. During this interview, the Defendant was "dope sick", that is to say she was in withdrawal from using heroin three days before and was non-responsive to about eighty percent of the questions in the interview; the Defendant requested and was given four or five smoke breaks outside of the building during this interview and also at one point was given soda to drink.

12. During the course of this interview, the Defendant did not admit to committing any criminal conduct.

13. The Defendant did not request to speak with an attorney during this interview.

14. The interview lasted approximately four hours.

15. The Defendant requested to leave to return home to take a shower, but the interview continued for another fifteen minutes regarding only the issue of whether the Defendant would return voluntarily to be interviewed again, and during these fifteen minutes Willgohs and Thomas did not attempt to elicit any substantive information regarding the burglary from the Defendant and the Defendant did not admit to any involvement in the burglary.

16. The interview was finally terminated by Willgohs and Thomas after the Defendant agreed to return

within two days to speak with her interviewers again.

## THE FIRST JANUARY 15, 2003 INTERVIEW

17. On the morning of January 15, 2003, Willgohs contacted Mitchell by telephone to attempt to convince him and the Defendant to come to the Barracks for a second interview, but Mitchell declined to come to the Barracks until the Defendant arrived at Mitchell's mother's home so that both of them could go to the Barracks together.

18. However, upon the return of the Defendant to Mitchell's mother's home on January 15, 2003, the Defendant was arrested on an outstanding unrelated warrant from Westmoreland County, ("Westmoreland warrant") by the Pennsylvania State Police in Somerset.

19. This arrest occurred when the Defendant and Mitchell could not be reached by telephone to be asked to voluntarily return to the State Police Barracks to resume their individual interviews regarding the burglary of the Mountain Man Sports Shop.[3]

20. The Westmoreland warrant contains no date indicating when it was served but the Westmoreland warrant was in fact served on the Defendant on March 21, 2003.

21. The Defendant and Mitchell were arrested on January 15, 2003 at approximately 12:50 P.M., handcuffed and transported to the Pennsylvania State Police Barracks in Somerset.

22. The Defendant was placed in the same interview room that had been used for her during the January 10, 2003 interview.

23. The Defendant was not "dope sick" this day.

24. The Defendant was advised of her *Miranda* rights prior to being asked any questions this day as she was once again read the "Statement of Rights" portion of an ATF Department of Treasury Waiver of Right to Remain Silent and of Right to Advice of Counsel form (Government's Exhibit 2; Defendant's Exhibit 1) to which she had no questions, shook her head in the affirmative in response to Willgohs' question of whether she understood her rights and, subsequently signed said form on January 15, 2003 at 1:15 P.M. indicating that she understood her rights; Willgohs did not read to the Defendant the "Waiver" portion of the form, which indicates that she was waiving her right to remain silent, her right to consult an attorney and have him present during questioning, but the Defendant read this portion on her own and also signed this "Waiver."

25. The purpose of arresting the Defendant on the Westmoreland warrant was to interview her regarding the instant offense; during the interview the Defendant denied any involvement in the instant offense.

26. The Defendant was not arraigned upon the Westmoreland warrant that day.

---

**3.** It appears that Mitchell was also arrested but the record is unclear as to the basis for his arrest. However, this issue is irrelevant for the present analysis.

27. During this interview the Defendant did not admit to committing any criminal conduct.

28. The Defendant never requested to speak to an attorney during this interview.

29. This interview lasted approximately twenty minutes, but Willgohs and Thomas were prepared to conduct an interview similar in length to the January 10, 2003 interview.

30. The interview ended when the Defendant indicated that she did not wish to speak anymore.

31. The Defendant was then taken back to the "crime room area" for approximately two and one-half hours to await the completion of Mitchell's interview and the preparation by the State Police of the paperwork necessary to charge the Defendant with the instant offense and not the offense for which she was arrested, *i.e.*, the Westmoreland County offenses found in the Westmoreland County warrant.

32. Thereafter, the State Police had the local magisterial district judge contacted and requested that he come to his office to arraign the Defendant and Mitchell.

33. Thomas and Trooper Tim Frew ("Frew") then transported Mitchell and the Defendant to the magisterial district judge's office and upon arrival of the police cruiser at the magisterial district judge's office, Mitchell indicated to Thomas and Frew that if they returned to the Barracks and if he were permitted to speak privately to the Defendant, that they would talk about the instant offense.

34. Before returning the Defendant and Mitchell to the Barracks, Thomas telephoned the Barracks to determine if Willgohs was still present at the Barracks and to speak with him concerning whether Mitchell could be interviewed again since he had invoked his right to an attorney.

## THE SECOND JANUARY 15, 2003 INTERVIEW

35. The Defendant and Mitchell were brought back to the State Police Barracks without being brought before the magisterial district judge.

36. Upon arrival at the State Police Barracks Mitchell indicated to Willgohs that he wished to speak with the Defendant privately and Mitchell and the Defendant were placed in a small interview room and the door to that room was shut.

37. The Defendant and Mitchell spoke together for approximately fifteen minutes; Willgohs asked twice if they were ready to talk and they said no, but, on the third time, the Defendant and Mitchell indicated to Willgohs that they were ready to talk.

38. Mitchell indicated that he and the Defendant wanted to be interviewed together.

39. It is not standard procedure for co-defendants to be interviewed together, but Willgohs and Thomas permitted this to occur in order to accommodate the request of Mitchell and the Defendant.

40. Mitchell and the Defendant were moved to another room where Mitchell again requested a few more minutes alone with the Defendant and that request was granted.

41. The Defendant and Mitchell were verbally advised of their *Miranda* rights again prior to the beginning of the interview, but only Mitchell signed a second ATF Department of Treasury Waiver of Right to Remain Silent and of Right to Advice of Counsel form; the Defendant was not requested to sign another such form.

42. The Defendant never expressly indicated to Willgohs or Thomas that she had changed her mind and wished to be interviewed again.

43. This interview of the Defendant and Mitchell was tape recorded and was conducted by Willgohs and Thomas; the Defendant and Mitchell were interviewed in each other's presence in the same room.

44. Mitchell answered most of the questions asked of the two defendants.

45. The Defendant did answer some of the questions and explained and/or corrected some of the answers given by Mitchell or agreed to some of Mitchell's answers by shaking her head in the affirmative.

46. The Defendant did not at any time during the taped interview request that the questioning be terminated or state that she wished to speak to an attorney.

47. This interview lasted approximately one hour.

48. During this interview, there was no yelling or screaming at the Defendant or Mitchell, they were not handcuffed, threatened, promised anything, physically touched nor were any "psychological ploys" used against them.

49. Mitchell and the Defendant were permitted to leave the Barracks at the conclusion of the interview and no charges were filed on the instant case or the Westmoreland County warrant that day.

## CONCLUSIONS OF LAW

1. The Fourth Amendment to the United States Constitution reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

2. The Fifth Amendment to the United States Constitution reads: "No person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend V.

3. Courts must analyze the "totality of the circumstances" when evaluating the voluntariness of a confession. *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

4. There is nothing in the record that suggests that any of the Defendant's rights were violated during the January 10, 2003 interview.

5. The Defendant was arrested on January 15, 2003 based upon an arrest warrant originating out of Westmoreland County, Pennsylvania.

6. This arrest was based upon an arrest warrant previously issued by Magisterial District Judge Roger F. Eckels, who had previously determined that probable cause existed to arrest the Defendant upon the charges set forth in the Westmore-

land warrant, *i.e.,* Criminal Conspiracy, Tampering with Evidence and Possession of Drug Paraphernalia. See Government Exhibit 5.

7. Law enforcement officers need not present a defendant before a "neutral and detached magistrate" for a probable cause hearing when such officers possess an arrest warrant for that defendant because the arrest warrant is evidence that a finding of probable cause has been established for the detention of the defendant. *Cf. Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (recognizing that upon a warrantless arrest of a suspect based upon probable cause, the Fourth Amendment requires that law enforcement must present the suspect before a judicial officer for a determination of probable cause as a condition to "significant pretrial restraint of liberty").

8. In *Gerstein v. Pugh,* 420 U.S. 103, 116–117, 95 S.Ct. 854, 864–865, 43 L.Ed.2d 54, 68 n. 18 (1975), the Court noted in *dicta* that "[a] person arrested under a warrant would have received a prior judicial determination of probable cause."

9. The Government is not required to comply with Federal Rule of Criminal Procedure 5 when a defendant was not initially taken into custody by federal law enforcement agents and not taken to a magistrate judge for arraignment; a defendant bears the burden of demonstrating that a "working arrangement" exists between local law enforcement authorities and federal law enforcement authorities to circumvent and thereby violate Federal Rule of Criminal Procedure 5 by delaying arraignment.

*See U.S. v. Mayes,* 552 F.2d 729 (6th Cir.1977).

10. Being arrested pursuant to an arrest warrant, the Defendant was legally taken and held in custody by state law enforcement officers on January 15, 2003.

11. Law enforcement officers are not required to have in their possession the arrest warrant for an individual when they arrest that individual pursuant to that arrest warrant. *See U.S. v. George,* 625 F.2d 1081, 1086 (3rd Cir.1980); FED.R.CRIM.P. 4(c); FED.R.CRIM.P. 4, advisory committee note, 2002 Amendments. *See also Commonwealth v. Gladfelter,* 226 Pa.Super. 538, 324 A.2d 518, 519–520 n. 3 (1974); PA. R.CRIM. P. 515 cmt.; PA. R.CRIM. P. 540.

12. The Court recognizes that it has long been the practice of law enforcement officers to question suspects held in custody regarding crimes and events unrelated to the specific criminal charge upon which the suspect was arrested. *See Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *Willis v. City of Chicago,* 999 F.2d 284 (7th Cir.1993); *United States v. Davis,* 174 F.3d 941 (8th Cir.1999).

13. The questioning of the Defendant by law enforcement officers during the first interview on January 15, 2003 was a proper and legal custodial interrogation in that the Defendant was "mirandized" and thereafter knowingly, intelligently and voluntarily waived her right to remain silent in order to speak with Willgohs and Thomas concerning the instant offense and not the charges in the Westmoreland warrant.

14. The actions of Willgohs and Thomas in obtaining custody by means of an arrest warrant of the Defendant five days after her previous interview, the reading of the *Miranda* warnings to the Defendant again on January 15, 2003, and interrogating the Defendant regarding the same crime about which she had been interviewed five days prior to that date is not in violation of *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) or *Vujosevic v. Rafferty*, 844 F.2d 1023 (3rd Cir. 1988); Willgohs and Thomas "scrupulously honored" the Defendant's invocation of her right to remain silent that was invoked on January 10, 2003.

15. The Court reaches the conclusion that the Defendant's right to remain silent as invoked on January 10, 2003 was "scrupulously honored" because five days had passed since her last interview and invocation of the right to remain silent, she was "re-mirandized" during her initial interview on January 15, 2003, and although she was questioned regarding the same crime she was questioned about on January 10, 2003, there exists no evidence that Willgohs and Thomas sought to have the Defendant abandon her right to remain silent as previously invoked on January 10, 2003. *See Vujosevic v. Rafferty*, 844 F.2d 1023, 1029–1030 (3rd Cir. 1988).

16. To be valid, a waiver of Fifth Amendment rights under *Miranda* must be knowing, intelligent and voluntary. *See Tague v. Louisiana*, 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980)(discussing knowing and intelligent waiver);

*Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

17. During the first interview of January 15, 2003, the Defendant was not in any way coerced into a confession regarding the instant offense after she waived her *Miranda* rights, but in fact she denied any involvement in the instant offense.

18. Defendant thereafter invoked her right to remain silent under the Fifth Amendment and *Miranda* and the interrogation of the Defendant regarding the instant offense ended.

19. In compliance with *Gerstein, supra,* and *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49, (1991) (detailing the standard of a "prompt" determination of probable cause after a pretrial detention), the Pennsylvania State Police proceeded to develop the paperwork necessary to charge the Defendant and Mitchell with the instant offense so that they could be transported to the magisterial district judge for a preliminary arraignment in accordance with Pennsylvania Rules of Criminal Procedure.

20. However, Willgohs and Thomas, as well as all other federal and state law enforcement officials involved in the arrest and interrogation of the Defendant, were operating under a "working arrangement" in that the actions taken by the state law enforcement officials were done for the benefit of the federal investigation of the Defendant and Mitchell and thereby, the state law enforcement officers, such as Thomas, were

bound by Federal Rule of Criminal Procedure 5(a) in that they were required to present the Defendant "without unnecessary delay before a magistrate judge." *See e.g. U.S. v. Rose*, 415 F.2d 742 (6th Cir. 1969) and *U.S. v. Broadhead*, 413 F.2d 1351 (7th Cir.1969); therefore the law enforcement officers involved in this matter were bound by the Federal Rules of Criminal Procedure and not the Pennsylvania Rules of Criminal Procedure.

21. The facts supporting this finding of a "working arrangement" are that the Defendant was not arraigned on the state arrest warrant charges or any other state criminal charges that day, but was released after being interviewed; Willgohs had interviewed the Defendant previously and interviewed the Defendant twice on January 15, 2003 asking the majority of the questions; the waiver of rights signed by the Defendant on January 10 and 15, 2003 was a Bureau of Alcohol, Tobacco and Firearms waiver form (See Suppression Hearing, Government's Exhibits 1 and 2 and Defendant's Exhibit 1); and Thomas consulted with Willgohs on the telephone concerning his continued availability at the Barracks should the Defendant be brought back and whether Mitchell could be interviewed again after invoking his right to an attorney.

22. Since the holding of *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), 18 U.S.C. § 3501 has been found to be unconstitutional and has no application to Federal Rule of Criminal Procedure 5.

23. The Court finds that the Defendant was not taken before a federal magistrate judge or a Pennsylvania magisterial district judge on January 15, 2003, therefore, in light of the *Dickerson* holding, and the resulting application of Rule 5 without any interplay with 18 U.S.C. § 3501, the Court must determine if the requirement that the Defendant be taken before a magistrate judge without "unnecessary delay" was violated in this case.

24. The failure to bring Defendant before a federal magistrate judge or a Pennsylvania magisterial district judge on January 15, 2003 was not caused by the failure of the federal and state law enforcement officers to comply with the requirement of Federal Rule of Criminal Procedure 5 to take the Defendant before a magistrate judge without unnecessary delay; rather, booking procedures for the Defendant began after her initial interview of January 15, 2003, and the Defendant waited while paper work was being generated concerning the instant charges, and accordingly, the delay caused by such actions is not unreasonable. *See Mallory v. U.S.*, 354 U.S. 449, 454, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479 (1957)(recognizing that "booking" procedures that do not seek to extract incriminating statements to support the arrest do not create an unnecessary delay).

25. Therefore, the Defendant's time spent waiting in the "crime room area" for two and one-half hours while charges were prepared against her and law enforcement officials were completing the interrogation of Mitchell was not an unnecessary delay.

26. Mitchell's request to the Pennsylvania State Police Troopers upon their arrival at the office of the magisterial district judge to return to the Barracks so that he could speak with the Defendant alone, and at which time he also indicated that they would tell Thomas and Willgohs the circumstances of the instant offense, did not violate any of the rights of the Defendant as the Defendant remained silent and was not "interrogated."

27. Upon their return to the Barracks, and after speaking with Mitchell in private, the Defendant and Mitchell were orally read their *Miranda* rights and the simultaneous interrogation of both the Defendant and Mitchell began.

28. The Defendant's waiver of her *Miranda* rights before the second interview was also a waiver of the Rule 5 requirements to be brought before a magistrate judge so that she could be warned of her constitutional rights by the magistrate judge. *See Frazier v. U.S.*, 419 F.2d 1161, 1166–1167 (D.C.Cir.1969).

29. The Court recognizes that silence in the face of questioning after being given *Miranda* warnings cannot be used to establish an adoptive admission on the part of a defendant. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (prohibiting use of post-arrest and post-*Miranda* silence in attempt to impeach a testifying defendant); *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980)(permitting use of statements offered by a defendant after being given *Miranda* warnings for the purposes of detailing inconsistency with trial testimony, but not permitting use of the absence of details from the prior statements because such absence of details is considered "silence"); *Hassine v. Zimmerman*, 160 F.3d 941, (3rd Cir.1998)(recognizing the applicability of *Doyle* ). *See also U.S. v. Yates*, 524 F.2d 1282 (D.C.Cir.1975). *Cf. United States v. Agee*, 597 F.2d 350, 354–355 (3rd Cir.1979) (noting that when a defendant chooses not to remain silent, he/she cannot rely upon *Doyle, supra* ).

30. Although silence of a defendant after being "mirandized" does not equate to a waiver of the rights required to be read under *Miranda*, waiver of the *Miranda* rights can occur through means other than express written or oral statements of waiver; whether a waiver of *Miranda* rights has occurred is judged by the "particular facts and circumstances surrounding that case, including the background experience, and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 374, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286, 293 (1979).

31. Waiver of *Miranda* rights can occur as a result of "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver . . . ." *Butler* at 373, 441 U.S. 369, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979).

32. *Miranda* warnings had been read to Defendant previously and she had an understanding of the rights contained in such warnings and *Miranda* warnings were read again to

Defendant prior to the beginning of the second interview of January 15, 2003.

33. In determining the validity of the waiver of a defendant's *Miranda* rights, the Court recognizes the law as set forth in *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979): "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."

34. The Defendant implicitly waived her *Miranda* rights in accordance with *Butler, supra,* by participating in the second interview of January 15, 2003 with Mitchell, answering the questions directed toward her, clarifying or adding to some of the answers given by Mitchell and by failing to deny the incriminating implications concerning her contained in Mitchell's statements.

35. The Government has demonstrated that the Defendant's waiver before the second interview of January 15, 2003 was voluntary, knowing and intelligent.

36. As to the Government's characterization of the statements given by Mitchell and the Defendant, the Court notes that there is very little guidance in the law regarding "joint confessions," specifically the definition thereof, and also notes that those "joint confessions" revealed by the Court's research almost exclusively concern confessions made by two or more individuals that are documented in writing. *See e.g., Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); *Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); *U.S. ex rel. Kern v. Maroney,* 275 F.Supp. 435 (W.D.Pa.1967).

37. However, because the Defendant had properly waived her *Miranda* rights by partaking in the second interview of January 15, 2003, the Defendant's *silence* and *failure to deny statements made by Mitchell* during the second interview make the statements made by Mitchell adoptive admissions by the Defendant pursuant to F.R.E. 801(d)(2)(B) as an innocent defendant would have responded in order to deny the statements made rather than acquiescing in such statements by remaining silent after hearing and understanding those statements. *See U.S. v. Robinson,* 275 F.3d 371 (4th Cir.2001). *Cf. U.S. v. Ghiz,* 491 F.2d 599, 600 (4th Cir. 1974).[4]

38. In conclusion, Mitchell's statements at the second interview of January 15, 2003, which have been found to be adoptive admissions of Defendant, are not precluded from ad-

4. The Court takes note of the fact that the Defendant and Mitchell had two private discussions prior to beginning the second interview of January 15, 2003 and the substance of these discussions are unknown; if it could be proven that coercion by Mitchell as influenced by law enforcement or law enforcement coercion directly played any role in the Defendant's partaking in the second interview, such coercion could possibly destroy the admissibility of the adoptive admissions of the Defendant. There is nothing present in the record to suggest such coercion in the case *sub judice* and therefore, the Court has not addressed it.

mission at trial under the Fourth and Fifth Amendments; however, the issue of the admissibility of those statements under the Sixth Amendment will be addressed.

39. The *statements* (as distinguished from her adoptive admissions) made by the Defendant are in and of themselves her admissions and may be admitted against her at trial in this matter.

## B. SIXTH AMENDMENT RIGHT TO CONFRONTATION[5]

 Having resolved the Fourth and Fifth Amendment issues surrounding the admissibility of the Defendant's own statements, the Court must address the issue raised by the Defendant concerning the applicability and effect of the Confrontation Clause of the Sixth Amendment to the admission into evidence of Mitchell's confession as an adoptive admission by the Defendant. As was made clear in the case of *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause demands two requisites for the admission of a previous *testimonial* statement against a defendant: 1) the unavailability of the declarant of the statement; and 2) the previous opportunity of the defendant to conduct cross-examination of the declarant concerning the statement at issue.

*Crawford* caused a change in Sixth Amendment law and, in making this shift in the interpretation of the jurisprudence surrounding the right to confrontation, the majority opinion noted that the case of *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) was overruled to the extent that *Roberts* permitted the introduction of out of court statements that were determined to be substantively reliable by the fact that the statements were " 'firmly rooted hearsay exception[s]' or bear[ing] 'particularized guarantees of trustworthiness.' " *Crawford* at 40, 541 U.S. 36, 124 S.Ct. 1354, 1358, 158 L.Ed.2d 177, 186 (2004). Rather, *Crawford* established that the reliability of testimonial evidence is measured through procedural means rather than through the use of a substantive understanding of what is reliable under the rules of evidence; specifically this reliability requirement can only be met for Sixth Amendment purposes through the procedure of affording an opportunity to cross-examine the declarant. *Crawford* at 61–62, 541 U.S. 36, 124 S.Ct. 1354, 1370, 158 L.Ed.2d 177, 199 (2004).

The Court clearly limited applicability of the holding of *Crawford* to testimonial evidence, which is the limit of the Sixth Amendment; examples of testimonial evidence are prior testimony in a former trial, preliminary hearing, or during a grand jury proceeding and *statements made during police interrogations. Crawford* at 68, 541 U.S. 36, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177, 203 (2004).

Clearly the questioning of Mitchell and the Defendant during the second interview of January 15, 2003 was a police interrogation thereby bringing Mitchell's statements within the definition of testimonial evidence as set forth by the *Crawford* opinion. Regarding whether Mitchell is unavailable, it has been found that a declarant's invocation of his Fifth Amendment privilege against self-incrimination makes the declarant "unavailable" for purposes of the Sixth Amendment. *See Latine v. Mann,* 25 F.3d 1162, 1166 (2nd Cir.1994); *Whelchel v. Washington,* 232 F.3d 1197, 1204 (9th Cir.2000); *Bourjaily v. U.S.,* 483 U.S. 171, 182, 107 S.Ct. 2775,

5. The Court relies upon the findings of fact set forth above under the analysis of the Fourth and Fifth Amendment issues in analyzing the following Sixth Amendment issue.

2782, 97 L.Ed.2d 144, 156–157(1987); *California v. Green,* 399 U.S. 149, 168, 90 S.Ct. 1930, 1940, 26 L.Ed.2d 489, 502 n. 17 (1970).

The interesting intervening event since the hearing upon the Defendant's motion to suppress is the guilty plea and sentencing of Mitchell for the acts he allegedly committed in tandem with the Defendant. As a result of his guilty plea on February 8, 2005, Mitchell has waived his privilege against self-incrimination. *See Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Therefore, the Court concludes that Mitchell is in fact available for purposes of the Sixth Amendment. As a result, Mitchell's statements, which are considered adoptive admissions of the Defendant, cannot be admitted into evidence at the Defendant's trial because the requirement of the Confrontation Clause that the declarant be unavailable is not met; rather, if the Government wishes to have Mitchell's testimony admitted into evidence Mitchell will have to be called as a witness and testify at the trial in person. However, the Court finds no Sixth Amendment bar to the admissibility of the statements made by the Defendant during the second interview of January 15, 2003.

■ Additionally, even if the Court found that Mitchell was "unavailable," no cross-examination of Mitchell by the Defendant was permitted, and therefore, pursuant to *Crawford,* Mitchell's statements, even though adopted by the Defendant, would be excluded from trial on this ground as well. This conclusion is consistent with *United States v. Monks,* 774 F.2d 945 (9th Cir.1985) even in light of the recent decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Similar to the matter of *United States v. Monks,* 774 F.2d 945 (9th Cir.1985), which was cited as precedent by both parties in the *case sub* judice,

the admissions of Mitchell are probative outside of the fact that the Defendant adopted them and therefore, such statements are not considered to automatically satisfy the Confrontation Clause under the logic of *Monks.* The *Monks'* court determined the unavailability of a declarant and the reliability of the declaration in accordance with the precedent of *Roberts* and Ninth Circuit progeny of that analysis. *Monks* at 952. In the advent of the *Crawford* decision, the *Monks* court's analysis seems to have been overruled to the extent that it concentrates on determining "reliability" through a substantive understanding under *Roberts.* *Monks* at 952–953. Since the *Crawford* decision, "reliability" of prior testimonial evidence under a right to confrontation analysis concerns the procedural previous ability to cross-examine a declarant and not the substantive reliability of the statement itself as required formerly under *Roberts.* Nevertheless, this Court would still agree with the *Monks* court that statements with probative value outside of the fact that a defendant adopted the statement as an admission do need to pass muster under the Confrontation Clause of the Sixth Amendment. Mitchell's statements that were adopted by the Defendant have such independent probative value.

Independent of the *Monks* analysis and decision, this Court notes that the determination that Mitchell's testimonial statements, *i.e.,* his statements made during police interrogation, are adoptive admissions of Defendant was based upon application of F.R.E. 801(d)(2)(B) and precedential caselaw applying substantive reliability criteria under that rule of evidence. Given the *Crawford* Court's determination that the reliability of testimonial statements, including statements made during police interrogations, is to be tested by compliance with the Sixth

Amendment Confrontation Clause, the fact that the statements of Mitchell have been found to be adoptive admissions of the Defendant, rather than merely testimonial statements of a third party, does not overcome or obviate the constitutionally based test set forth in *Crawford.* Therefore, this Court finds that even if Mitchell was unavailable, the statements of Mitchell, which have been found to be adoptive admissions of the Defendant, are not admissible under *Crawford's* Confrontation Clause analysis because at the time Mitchell made those statements he was not subject to cross-examination.

## II. *MOTION TO PRODUCE EVIDENCE WHICH THE GOVERNMENT INTENDS TO USE UNDER FEDERAL RULES OF EVIDENCE 404(b) AND 609 WITH CITATION OF AUTHORITY*

The Defendant has requested this Court to issue an order directing the Government to produce such evidence that would be considered "prior bad acts" under Federal Rule of Evidence 404(b) or prior convictions within the past ten years under Federal Rule of Evidence 609 prior to trial and to conduct a hearing before the Court to take testimony of the Defendant or other witnesses to enable the Court to rule upon the admissibility of such evidence produced. Regarding F.R.E. 609, in its Omnibus Response (Document No. 33) the Government indicates that it intends to offer as evidence two felony convictions of the Defendant, namely "1993–Criminal Conspiracy/Forgery" and "1995–Forgery." Since the specific dates of conviction are not set forth in the record and the dates of release from confinement resulting from these convictions are not supplied by the Government by way of affidavits or exhibits, the Court orders the Government to produce all relevant information in its possession regarding these two offenses to the

Defendant if it has not done so already. Absent a stipulation by the parties to these factual issues, the Court will need to conduct a hearing and take evidence as to the relevant circumstances of these convictions to determine if they fall within the ten year time limit set forth in Federal Rule of Evidence 609(b) so as to be admissible at trial. Subsequent to receipt of the information ordered to be produced, Defendant may request a hearing or argument concerning the admissibility of these prior convictions.

Regarding Federal Rule of Evidence 404(b), the Government notes that at trial it intends to offer evidence of the Defendant's addiction to heroin and her actions subsequent to the alleged theft of firearms which involved transporting and selling those firearms to an individual in the Pittsburgh area, in exchange for heroin and crack cocaine. However, the Government argues that such evidence does not constitute prior bad acts that are "extrinsic" to the current criminal charge against the Defendant pursuant to 18 U.S.C. § 922(u) and § 924(i)(1) and (2), but such evidence is in fact "intrinsic" to the crime charged and thus not considered prior bad acts under Federal Rule of Evidence 404(b). The government cites to the case of *United States v. Conley, et al.,* 878 F.Supp. 751 (W.D.Pa.1994) in support of the proposition that the evidence regarding the Defendant's heroin addiction and acts in facilitating the sale of stolen weapons are "intrinsic" to the crimes charged.

In the *Conley* case, Judge Lee noted that the Third Circuit had not yet embraced the distinction between "extrinsic" acts and "intrinsic" acts as other courts have related such concepts to Rule 404(b). Nevertheless, Judge Lee followed this extrinsic/intrinsic analysis and modified a previous order recognizing that other district courts of this circuit applied this anal-

ysis, and he indicated that acts that "include uncharged overt acts undertaken in furtherance of the conspiracy and uncharged 'other crimes, wrongs or acts' which are offered as direct proof of the elements of the substantive crimes charged" were intrinsic to the crimes charged. *Conley* at 754. The concept of "intrinsic" was addressed in *Conley* with citation to the Tenth Circuit case of *United States v. Record,* 873 F.2d 1363, 1372 n. 5 (10th Cir.1989) which explained "intrinsic" by describing what is *not* extrinsic: "An uncharged act may not be extrinsic if: (1) The act was part of the scheme for which a defendant is being prosecuted; *Record,* 873 F.2d at 1372 n. 5, or (2) The act was 'inextricably intertwined with the charged crime such that a witness' testimony 'would have been confusing and incomplete without mention of the prior act.' " *Conley* at 754 (external citations omitted).

Our research reveals that the Third Circuit has recognized the application of Rule 404(b) to "extrinsic acts" but has not further recognized the dichotomy between extrinsic and intrinsic acts as set forth in the *Conley* opinion. *Government of Virgin Islands v. Archibald,* 987 F.2d 180, 184–185 (3rd Cir.1993). *See also United States v. Butch,* 48 F.Supp.2d 453 (D.N.J.1999)(recognizing that the district courts of the Third Circuit are divided on the issue of whether the Third Circuit Court of Appeals has recognized the "intrinsic" and "extrinsic" dichotomy).

▆▆▆ Still, the Court agrees with the Government that the Defendant's use of and addiction to heroin and the taking of the stolen weapons to the Pittsburgh area and their subsequent sale there are intrinsic to the offense charged in the indictment and are admissible at trial. This is so because the sale of the weapons provides necessary information for the jury as to the act of stealing these weapons and the addiction/use of heroin further delineates essential background information as to the transportation and sale of the weapons which is necessary evidence to prove the crime charged. Evidence concerning the theft of the weapons is incomplete without these two further pieces of information. The addiction to/use of heroin and the sale of weapons stolen are part of a "single criminal episode" and thus intrinsic to the crime charged in the superseding indictment. *See U.S. v. Williams,* 900 F.2d 823, 825 (5th Cir.1990).

▆▆▆ Even if the Court would have found these two "acts" to be "extrinsic," the Court would find them admissible under Rule 404(b) as evidence of motive, intent, and plan. In discussing Rule 404(b) the United States Supreme Court has held that four requirements must be met to introduce evidence of "prior bad acts":

> We share petitioner's concern that unduly prejudicial evidence might be introduced under Rule 404(b). *See Michelson v. United States,* 335 U.S. 469, 475–476, 69 S.Ct. 213, 218–219, 93 L.Ed. 168 (1948). We think, however, that the protection against such unfair prejudice emanates not from a requirement of a preliminary finding by the trial court, but rather from four other sources: first, from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; second, from the relevancy requirement of Rule 402—as enforced through Rule 104(b); third, from the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice, see Advisory Committee's Notes on Fed.Rule Evid. 404(b), 28 U.S.C.App., p. 691; S.Rep. No. 93–1277, at 25; and fourth, from Federal Rule of Evidence

105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted. *See United States v. Ingraham*, 832 F.2d 229, 235 (C.A.1 1987).

*Huddleston v. U.S.*, 485 U.S. 681, 691–692, 108 S.Ct. 1496, 1501–1502, 99 L.Ed.2d 771, 784 (1988) (footnote omitted). *Accord, Government of Virgin Islands v. Harris,* 938 F.2d 401, 419 (3rd Cir.1991) and *Becker v. ARCO Chemical Co.,* 207 F.3d 176, 189 (3rd Cir.2000).

▮ Under the first element of this analysis, the proper purpose for which the evidence can be introduced in the case *sub judice* is motive, intent and plan. Second, the evidence is relevant to these three matters for which the evidence is offered, specifically the plan and the motive found in the evidence that the weapons were stolen in order to be used in trade for heroin and other illegal substances. Third, in balancing the probative force of the evidence versus the possible prejudicial impact of the evidence, the Court finds that the probative value is not substantially outweighed by unfair prejudice, confusion of issues or misleading of the jury and, additionally, it would not cause a delay or waste of time at the trial or be cumulative in any way under Rule 403 because the presentation of this evidence describes the complete version of the events of this crime from its inception. It would not confuse or mislead the jury, or create any of the other circumstances contemplated by Rule 403, but, in fact, would assist the jury in its understanding of this crime; otherwise the jury is without knowledge of the reason for the theft of weapons and could infer a more prejudicial scenario such as the theft of the weapons for the purpose of a premeditated act of murder or assault by the Defendant, when

in fact they were intended to be an item of trade to facilitate and benefit the Defendant's addiction. The fact is that this evidence concerns illegal substances and the sale of weapons which could evoke an emotional response from the jury, but the Court believes that that type of a response, even if present, would not result in unfair prejudice so as to allow the jury to make a decision to convict based upon such improper considerations.

The evidence concerning use/addiction to heroin and the sale of the weapons is highly probative of the fact that the Defendant was part of the preparation and execution of the plan to steal weapons in that she intended to use the weapons as items of trade for heroin and crack. Such evidence demonstrating these surrounding circumstances provides probative evidence of the Defendant's involvement in the crime charged. Finally, for the fourth consideration, the Court can provide the necessary limiting instruction to the jury at the time of trial to ensure that the jury does not rely upon these two pieces of evidence as evidence of the Defendant's character and that her actions were made in conformity therewith or that conviction should be based upon the existence of these grounds apart from the elements of crime charged.

Therefore, the Court finds the evidence of the Defendant's use of/addiction to heroin and her role in the sale of weapons is admissible evidence under Federal Rule of Evidence 404(b).

**AND NOW,** this 6th day of June, 2005, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT:

1. The Defendant's Motion to Suppress (Document 30) is GRANTED IN PART as to her Sixth Amendment Confrontation Clause argument and the Government is precluded from offering into evidence at

trial the statements of co-defendant David W. Mitchell made during the second interview on January 15, 2003, which have been found to be adoptive admissions of the Defendant, and the Government cannot seek to introduce such adoptive admissions through any other person's testimony or any other form of evidence as these actions would violate the Defendant's Sixth Amendment right to confrontation of witnesses against her;

2. The Defendant's Motion to Suppress (Document No. 30) is DENIED IN PART as to those statements made by the Defendant herself during the second interview on January 15, 2003 and those statements are admissible against her at trial;

3. The Defendant's Motion to Suppress (Document No. 30) is DENIED IN PART as to all of her arguments made pursuant to the Fourth and Fifth Amendments;

4. The Defendant's Motion to Produce Evidence (Document No. 31) is GRANTED IN PART as to the evidence sought to be introduced by the Government under Federal Rule of Evidence 609 and the Government is ordered to produce all information in its possession as to the two convictions referenced in its Omnibus Response (Document No. 33), *i.e.*, the 1993 conviction of criminal conspiracy/forgery and the 1995 conviction of forgery and the Court will hereafter schedule a hearing in the event that counsel for both parties are unable to stipulate as to the dates of conviction and dates of release for the sentences of confinement resulting from the convictions and, further, Defendant, after receipt of the information ordered to be produced, may request a hearing or argument concerning the admissibility of these prior convictions; and DENIED IN PART as to evidence that is sought to be introduced by the Government under Federal Rule of Evidence 404(b) as such evidence is intrinsic to the crime charged against the Defendant;

5. The Defendant's Motion for Discovery of Taped Statement (Document No. 32) is found by the Court to be moot as the Government has previously agreed to provide the requested statement and therefore the Clerk of Court is directed to administratively terminate this motion; and

6. The Defendant's Motion for Severance of Defendants (Document No. 29) is found to be moot as the Defendant's co-defendant David W. Mitchell has previously plead guilty and has been sentenced to a term of imprisonment and therefore the Clerk of Court is directed to administratively terminate this motion.