

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-28-2007

# USA v. Lafferty

Precedential or Non-Precedential: Precedential

Docket No. 06-1901

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Lafferty" (2007). *2007 Decisions.* Paper 321.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/321

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-1901
_____

UNITED STATES OF AMERICA

v.

AMY L. LAFFERTY,
a/k/a Amy L. Lowery
Amy L. Lafferty
Appellant

_____

Appeal from the United States District Court
for the Western District of Pennsylvania
(Crim. No. 04-cr-00007-2)
District Judge: Hon. Kim R. Gibson

_____

Argued on April 17, 2007

Before: McKEE, AMBRO, *Circuit Judges,* and

ACKERMAN[*], *District Judge*

(Opinion Filed: September 28, 2007)

Kimberly R. Brunson (**Argued**)
Karen S. Gerlach
Office of Federal Public Defender
1001 Liberty Avenue
1450 Liberty Center
Pittsburgh, PA 15222

   *Attorneys for Appellant*

Robert L. Eberhardt (**Argued**)
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

   *Attorney for Appellee*

**OPINION**

McKee, *Circuit Judge*

---

[*]The Honorable Harold Ackerman, Senior Judge, United States District Court for the District of New Jersey, sitting by designation.

Amy Lafferty challenges the district court's denial of her motion to suppress statements she and an alleged confederate made during a custodial interrogation. She argues that admission of those statements violates her Fifth Amendment privilege against self incrimination and her Sixth Amendment right to confront the witnesses against her. For the reasons that follow, we will reverse the order denying her suppression motion and remand for further proceedings consistent with this opinion.[1]

**I. Facts and Procedural History**

On January 10, 2003, ATF Special Agent Mark Willgohs called Lafferty and her boyfriend, David Mitchell, in order to arrange to interview them about a recent burglary in the area. Both Lafferty and Mitchell agreed to go to the police station to

---

[1]We have jurisdiction pursuant to 28 U.S.C. § 1291.

be interviewed, and they reported as promised, later that afternoon.

Upon arriving at the police station, police put Lafferty and Mitchell in different interrogation rooms for questioning. In Lafferty's interrogation room, Willgohs produced an ATF Waiver of Right to Remain Silent and of Right to Advice of Counsel form (the "form"). The form contained a statement of rights section (explaining a suspect's constitutional rights) and a waiver section (stating that a suspect had been advised of his/her constitutional rights and had chosen to waive those rights). Willgohs read the statement of rights section of the form to Lafferty and she signed it. Lafferty then read the waiver section of the form on her own and also signed it.

During the next four hours, Willgohs questioned Lafferty about the burglary of the Mountain Man Sports Shop ("Mountain Man"), where eight guns had been stolen. Lafferty

4

did not respond to most of the questions, but when she did respond she denied any involvement in the burglary. Eventually, Lafferty said that she was "dope sick," meaning that she was experiencing symptoms of withdrawal from not having used heroin for three days, and she asked to go home so she could shower.

The interrogation continued for approximately fifteen minutes after Lafferty asked to leave. During that time, Willgohs tried to get Lafferty to agree to return voluntarily to the police station to answer more questions about the burglary. The interrogation session finally ended when Lafferty said she would return to the police station within two days.[2]

On January 15, 2003, Willgohs called Mitchell at his mother's house and asked Mitchell if he and Lafferty would

---

[2]We will refer to this interrogation as the "January 10 interrogation."

5

agree to come back to the police station to answer more questions about the burglary.  However, Lafferty was not there, and Mitchell refused to come to the police station without her.  When Lafferty eventually arrived at Mitchell's mother's house, police officers arrested her on an outstanding, unrelated warrant.  The police also took Mitchell into custody, and drove both of them to the police station.

There, Lafferty and Mitchell were again placed in different interrogation rooms,  Willgohs read Lafferty the statement of rights portion of the form once again, and she again signed it.  Lafferty then read the form's waiver of rights section, and she also signed it.  After Lafferty signed the waiver, Willgohs resumed his questioning about the burglary, but Lafferty again denied any involvement.  After approximately twenty minutes of questioning, Lafferty said: "[I]f you're going to charge me, charge me.  I'm not going to sit here for four to

6

five hours like last time." At that point, the interrogation ceased, and police officers put Lafferty in another room. Meanwhile, officers continued to interrogate Mitchell and prepared paperwork to charge Lafferty with the burglary.[3]

Lafferty waited for more than two hours while the police interrogated Mitchell. Eventually, Mitchell's interrogation ended when he asked to speak to an attorney. The police then prepared documents charging both Lafferty and Mitchell with the burglary, and called the local Magistrate Judge to arrange for them to be arraigned.

State troopers then drove Lafferty and Mitchell to the courthouse for arraignment. As they drove into the courthouse's parking lot, Mitchell told the officers that, if they took him and Lafferty back to the police station and let them talk privately,

---

[3]We will refer to this interrogation as the "first January 15 interrogation."

7

they would tell the police about the burglary. The troopers agreed to take them back to the police station so long as Mitchell agreed to provide information when they returned. Lafferty remained silent while Mitchell brokered this deal with the police. Unlike Mitchell, she never agreed to speak with them.

The troopers then drove Lafferty and Mitchell back to the police station without having them arraigned. Back at the police station, Lafferty and Mitchell were put in a small room together by themselves. After approximately fifteen minutes and three interruptions by police, Mitchell told Willgohs that they were ready to talk, but explained that he and Lafferty wanted to speak with police together.

Before questioning resumed, police again advised Lafferty and Mitchell of their *Miranda* rights.[4] Mitchell again

---

[4]See *Miranda v. Arizona*, 384 U.S 436 (1966).

was asked to sign the statement of rights portion of the form, and he verbally retracted his previous request for counsel. Lafferty was not asked to sign the statement of rights section of the form again, and she did not sign the waiver portion of the form or verbally waive her right to remain silent.

Willgohs then began questioning Lafferty and Mitchell about the Mountain Man burglary in the presence of three ATF agents and two police officers. During the course of the ensuing hour-long interrogation, Mitchell answered most of the questions. In doing so, he managed to incriminate both himself and Lafferty. Although Lafferty was silent for the most part, she did respond to questions directly addressed to her. She also occasionally explained and/or clarified answers that Mitchell gave, and indicated that she agreed with some of Mitchell's answers by nodding her head. However, it is not clear which of Mitchell's statements Lafferty assented to in this manner. When

9

the interrogation was over, Lafferty and Mitchell left the police station without any charges being filed.[5]

Thereafter, Lafferty was indicted for violating 18 U.S.C. §§ 922(u), 924(i)(1), and (2). The government alleged that Lafferty and Mitchell burglarized Mountain Man, a federally licensed gun dealer, to steal guns that they intended to trade for drugs. Following her indictment, Lafferty filed several pretrial motions, including a motion to suppress the statements she had made in response to Willgohs's questions at the second January 15 interrogation. She also asked the court to suppress statements Mitchell made during that interview implicating her in the burglary.

The district court granted Lafferty's suppression motion in part, and denied it in part. The court found that Lafferty did

---

[5]We will refer to this interrogation as the "second January 15 interrogation."

not speak to the police from the time she invoked her right to remain silent until she responded to Willgohs's questions during the second January 15 interrogation. However, the court held that she had implicitly waived her Fifth Amendment privilege against self incrimination by participating in the second January 15 interrogation, by answering the questions Willgohs asked of her, by clarifying and/or adding to some of the answers Mitchell gave, and by failing to deny statements Mitchell gave that implicated her in the burglary. *United States v. Lafferty*, 372 F. Supp. 2d 446, 459 (W.D. Pa. 2005) ("*Lafferty I*").

The district court also held that Lafferty had adopted Mitchell's statements as her own pursuant to Federal Rule of Evidence 801(d)(2)(B). The court reasoned that an innocent person under the circumstances would have denied the incriminating statements rather than remain silent. *Id.* Nonetheless, the court ruled Mitchell's statements inadmissible

11

against Lafferty because admitting them would violate her right of confrontation under *Crawford v. Washington*, 372 F. Supp. 2d 541 U.S. 36 (2004) at 460-61.

The government thereafter asked the district court to reconsider its ruling that Mitchell's statements were inadmissible against Lafferty under *Crawford*.[6] *United States v. Lafferty*, 387 F. Supp. 2d 500, 502 (W.D. Pa. 2005) ("*Lafferty II*"). Upon reconsideration, the district court agreed that the government had proven by a preponderance of the evidence that Lafferty's silence in the face of Mitchell's incriminating

---

[6]The government also argued that Mitchell's statements were admissible against Lafferty because his statements were made during a "joint confession." Because Mitchell asked that he and Lafferty be interviewed together, the government contended that they presented themselves as a single unit and their statements therefore should be equally admissible against each other. See Fed. R. Evid. 801(d)(2)(A) (making admissible against a party "the party's own statement, in either an individual or a representative capacity"). The district court rejected this argument.

12

statements established Lafferty's "intent to adopt Mitchell's statements." *Id.* at 510 (quotation omitted). The court cautioned, however, that the ultimate determination "as to whether an adoptive admission was made by [Lafferty] must be left to a jury using the standard of reasonable doubt." *Id.*

In ruling that Mitchell's statements were admissible against Lafferty, the court reasoned that, "[a]ssuming the jury concludes that the statements of Mitchell are also adoptive admissions of [Lafferty], the Sixth Amendment right to confrontation is not violated." *Id.* at 511. Lafferty thereafter entered a conditional guilty plea, and the court sentenced her to thirty-seven months imprisonment. This appeal followed.

## II. Discussion

### A.

Lafferty first argues that the district court erred in denying her suppression motion because the statements she

13

made in response to Willgohs's questions were elicited in violation of her Fifth Amendment privilege against self incrimination. "We review the district court's denial of [a] motion to suppress for clear error as to the underlying facts, but exercise plenary review as to its legality in light of the court's properly found facts." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) (quotation omitted).

In *Miranda*, the Supreme Court established custodial interrogation procedures to safeguard a suspect's Fifth Amendment privilege against self incrimination. The Court instructed that a suspect

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation.

14

384 U.S. at 478. "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74.

In *Michigan v. Mosley*, 423 U.S. 96 (1975), the Court amplified the mandate that "the interrogation must cease" after a suspect invokes her/his right to remain silent. There, the Court explained that this requirement does not mean that a suspect's invocation of his/her right to remain silent permanently prevents the police from ever asking questions of the suspect again. *Id.* at 102. Nor, however, does the phrase mean that police may resume questioning of a suspect who has invoked the right after a brief time-out. *Id.* The Court reasoned that these two extreme interpretations would both lead to absurd results. The latter interpretation "would clearly frustrate the purpose of *Miranda*

15

by allowing repeated rounds of questioning to undermine the will of the person being questioned." *Id.*

"Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been . . . invoked." *Miranda*, 384 U.S. at 474. By exercising his/her right to terminate questioning, a suspect "can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Mosley*, 423 U.S. at 104. *Mosley* teaches that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was *scrupulously honored*." 384 U.S. at 104 (emphasis in original).

In *Mosley*, a suspect was arrested on robbery charges and thereafter invoked his right to remain silent. Several hours later, the police again gave him his *Miranda* warnings, and Mosley

16

agreed to answer questions about a related homicide. He eventually confessed to that other crime. At trial, the state court admitted Mosley's confession and rejected his argument that the second interrogation violated *Miranda*. The Supreme Court affirmed, explaining:

> This is not a case . . . where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.

*Mosley*, 423 U.S. at 105-06.

Thereafter, in *Vujosevic v. Rafferty*, 844 F.2d 1023 (3d Cir. 1988), we had to decide if the defendant's right to cut off questioning had been scrupulously honored as *Mosley* commands. The police had arrested Vujosevic on a Friday night

17

on suspicion of murder, and advised him of his *Miranda* rights. When Vujosevic invoked his right to remain silent, the police stopped the interrogation and took him to a holding cell. Approximately twenty minutes later, police again warned Vujosevic of his rights and asked him to sign a form acknowledging that he understood those rights. Again, Vujosevic refused to speak to police, and the interrogation ended. Several hours later, on Saturday morning, police read Vujosevic his rights for the third time. This time, he signed a waiver and told the police that he did not remember anything about the previous night. Around 9:00 p.m. Sunday night, police warned Vujosevic of his rights for the fourth time, and told him that his brother had been arrested and charged with the killing. At about 9:40 p.m., Vujosevic confessed to the killing. *Id.* at 1025-26.

18

We held that Vujosevic's confession was not constitutionally admissible at his trial because the police failed to scrupulously observe his right to remain silent. *Id.* at 1030. Although we credited the police with stopping the interrogations each time Vujosevic invoked the privilege, we nevertheless were troubled by the fact that he did not confess to the killing until he had been questioned about the crime on four different occasions.[7] *Id.* at 1029. We distinguished cases that held that a "defendant's right to remain silent had been scrupulously honored despite the resumption of questioning on more than one

_____

[7]We also expressed concern in *Vujosevic* that the police had essentially "bluffed [the defendant] into agreeing." 844 F.2d at 1029. Although we found this fact significant for purposes of distinguishing *Mosley*, it is clear from our reasoning in *Vujosevic* that the police officers' repeated questioning of the defendant under the circumstances for the purpose of getting him to inculpate himself in the crime was sufficient by itself to establish a constitutional violation. As we shall explain, given the circumstances here, the fact that the police did not "dupe" Lafferty into participating in the second January 15 interrogation does not dictate the outcome of our inquiry.

19

occasion." *Id.* We observed: "[i]n none of those cases did the facts give rise to an inference that the sole purpose for resuming questioning was to persuade the defendant to abandon his right to remain silent." *Id.* at 1029. Rather, Vujosevic's interrogation resembled "cases where the right to remain silent was held not to have been scrupulously honored" because "the police resumed questioning for no other reason than to induce the defendant to change his mind." *Id.*

We again addressed a defendant's claim that police officers failed to scrupulously honor the privilege against self incrimination in *Nelson v. Fulcomer*, 911 F.2d 928 (3d Cir. 1990), *superseded by statute*, Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, *as recognized in Berryman v. Morton*, 100 F.3d 1089 (3d Cir. 1996). Nelson was arrested on charges of rape and murder, and invoked his right to remain silent before being interrogated. In

20

another interrogation room, police were questioning Terrence Moore in connection with the same crimes. Moore confessed to his involvement in the rape and murder, and said that Nelson had initiated the crimes. After Moore confessed, police officers put him in a room with Nelson after telling Moore to tell Nelson that he had confessed. During their brief conversation, Nelson asked Moore, "How much did you tell them?" Moore replied, "I told it all." *Id.* at 930. Hearing this, Nelson requested that Moore be taken from the room, and Moore told the police what Nelson had said to him.

Nelson was thereafter convicted of the rape and murder in state court. On habeas review, the district court rejected Nelson's argument that the Constitution required the suppression of his exchange with Moore. On appeal, we first reiterated that "[u]nder *Miranda v. Arizona*, if a suspect indicates in any manner at any time prior to or during

21

questioning, that he wishes to remain silent, the interrogation must cease. If the state violates this rule, the prosecution may not use a suspect's responses to the custodial interrogation in its case-in-chief." *Id.* at 932 (quotation and citation omitted). We then noted that "[c]ustodial interrogation encompasses not only direct questioning by the police, but also its 'functional equivalent.'" *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)).

Accordingly, we inquired whether the police "ploy" of putting Moore in the same room with Nelson was the functional equivalent of a police interrogation. In resolving that issue, we explained that "the Court in *Innis* interpreted *Miranda*'s prohibition against interrogation to bar not only express questioning, but 'also any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to

22

elicit an incriminating response from the suspect.'" *Nelson*, 911 F.2d at 933 (quoting *Innis*, 446 U.S. at 301). However, we did not reach a conclusion on this issue because the district court had failed to determine if Nelson knew that Moore had confessed when Moore entered the interrogation room. We reasoned:

> [I]f the police, or Moore at the police's instruction, had already confronted Nelson with the confession, then this case falls squarely under *Innis*'s prohibition of ploys reasonably likely to elicit an incriminating response. On the other hand, if Nelson had not been informed of the confession by the words or conduct of Moore or the police, the suppression of the remark was not required . . . .

*Id.* at 934. We therefore remanded to the district court for an evidentiary hearing on whether Moore's confession had, in fact, been communicated to Nelson prior to Nelson's inculpatory statement. *Id.* at 938

However, we did rule on whether the police had scrupulously honored Nelson's right to cut off questioning when they told Moore to go into the same room as Nelson. We concluded that they had not. *Id* at 939. We explained that putting Moore and Nelson in the same room after Nelson had invoked his right to remain silent bore "none of the indicia of

23

respect identified in *Mosley*." We explained that the government

> failed to contend, let alone demonstrate, that it waited a significant amount of time after Nelson cut off questioning, gave Nelson a fresh set of *Miranda* warnings, that Nelson had invoked his right in connection with an offense other than the rape and murder, or that the officers who engineered the confrontation were different from those whom Nelson initially refused to talk.

*Id.* at 940. Rather than scrupulously respecting Nelson's right to cut off questioning, we concluded that "all the evidence suggests that the detectives used the ploy 'for no other reason than to induce the defendant to change his mind.'" *Id.* (quoting *Vujosevic*, 844 F.2d at 1029).

Most recently, in *United States v. Tyler*, 164 F.3d 150 (3d Cir. 1998), we dealt with a defendant's allegation that his privilege against self incrimination had been violated by continued police questioning after he had invoked his right to remain silent. Tyler was arrested on suspicion of murdering a government witness who was going to testify against his brother. After the police advised Tyler of his *Miranda* warnings, he said that he did not want to make a statement. The interrogation ended at that point, and Tyler was put in a small room with a police officer guarding him. Tyler and the officer

talked for a little less than one hour when Tyler began to cry. When Tyler started crying, the police officer told him to "tell the truth" and then advised him of his *Miranda* rights again. Thereafter, Tyler made inculpatory statements that were later admitted against him at trial. *Id.* at 153-54.

On appeal, we held that the inculpatory statements were inadmissible because they violated Tyler's privilege against self incrimination. We explained that the police instructing Tyler "to tell the truth" after he "had invoked his *Miranda* rights is the antithesis of scrupulously honoring his right to remain silent." *Id.* Moreover, we reasoned that the police could not "negate Tyler's invocation of his right to remain silent by a mantra-like recitation of *Miranda* warnings" because "[t]he warnings are not intended to be a mere ritual, the exercise of which guarantees the admissibility of any statement that is obtained in a custodial interrogation regardless of the circumstances." *Id*. at 155.

Here, the district court concluded that the police did not fail to scrupulously honor Lafferty's privilege against self incrimination by questioning her about the burglary during the first January 15 interrogation. First, the court noted that five days had passed between the time Lafferty invoked the right on

25

January 10 and the first January 15 interrogation. Additionally, the court observed that the officers gave Lafferty a fresh set of warnings before questioning her during the first January 15 interrogation. The court also reasoned that, although Lafferty was questioned about the same crime during the first January 15 interrogation as she had been during the January 10 interrogation, there was no evidence that the officers questioned her to make her change her mind. *Lafferty*, 372 F. Supp. 2d at 455-56.

However, even if we were to agree that the police scrupulously honored her right to cut off questioning at the first January 15 interrogation, we would still be troubled by the fact that police put Lafferty in an interrogation room with Mitchell and subjected her to more questions at the second January 15 interrogation after she had invoked her right to remain silent during the first January 15 interrogation. We realize, of course, that Mitchell and Lafferty were placed together in the same room during the second January 15 interrogation at Mitchell's request, not as part of a police ploy. Thus, this is not a situation where the police schemed to create a situation where Lafferty would rescind invocation of her right to remain silent.

Nevertheless, the arrangement itself, as well as the questioning during the second January 15 interrogation, were inconsistent with scrupulously honoring Lafferty's assertion of her right to remain silent. Mitchell had no authority to waive Lafferty's Fifth Amendment privilege for her, and police should not have ignored the rather obvious fact that the joint interrogation would likely force Lafferty to either react to Mitchell's statements or suggest her assent to those statements by remaining silent while he incriminated her in a conspiracy. Under *Mosely*, Lafferty can not be placed between such a constitutional rock and Fifth Amendment hard place unless she places herself there by a valid *Miranda* waiver; and the circumstances here do not establish that such a waiver occurred.

In *North Carolina v. Butler*, 441 U.S. 369, 373 (1979), the Supreme Court instructed that "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." The Court did not, however, define the circumstances that could result in an implied waiver. Rather, "we must determine the question of waiver on the particular facts and circumstances surrounding [each] case, including the background, experience and conduct of the accused." *United*

*States v. Velasquez*, 626 F.2d 314, 320 (3d Cir. 1980) (quotation marks omitted).

Although the district court recognized that a suspect's silence after *Miranda* warnings can not, by itself, be construed as a waiver of constitutional rights, the court nonetheless found an implied waiver of Lafferty's right to remain silent. *Lafferty*, 372 F. Supp. 2d at 458-59. The court reasoned that Lafferty waived her right to remain silent by: (1) participating in the second January 15 interrogation; (2) answering questions asked of her during that interview; (3) clarifying or augmenting Mitchell's statements; and (4) not denying Mitchell's statements implicating her in the burglary. *Id*. at 459. Based on the district court's finding that Lafferty waived her right to remain silent, it concluded that the Fifth Amendment did not preclude either Lafferty's or Mitchell's statements from being introduced against Lafferty at trial.

As an initial matter it is clear that, under the circumstances here, we can not infer that Lafferty waived her right to remain silent merely because she was willing to go into the interrogation with Mitchell. Lafferty did not ask to leave the courthouse and return to the police station; Mitchell did. It was

28

not Lafferty's decision to go into a room to speak with Mitchell privately when they returned, and she neither asked to be interrogated along with him nor agreed to the procedure. Although she apparently relented to Mitchell's requests, more is required to waive a constitutional right under these circumstances.

The Fifth Amendment precludes Lafferty's statements during the second January 15 interrogation from being admitted at trial if law enforcement officers failed to scrupulously honor her right to cut off questioning when eliciting those statements. *Mosley* identified four factors that help decide whether a suspect's right to cease questioning was scrupulously honored: (1) whether a significant amount of time lapsed between the suspect's invocation of the right to remain silent and further questioning; (2) whether the same officer conducts the interrogation where the suspect invokes the right and the subsequent interrogation; (3) whether the suspect is given a fresh set of *Miranda* warnings before the subsequent interrogation; and (4) whether the subsequent interrogation concerns the same crime as the interrogation previously cut off by the suspect. *Mosley*, 423 U.S. at 105-06.

Although it is unclear from the record exactly how much time elapsed between the first and second January 15 interrogations, we do know that the second interview did not occur until after Lafferty waited in a room for more than two hours, rode to the courthouse, returned to the police station, and talked to Mitchell privately for approximately fifteen minutes. In *Mosley*, the Supreme Court concluded that waiting a little more than two hours was adequate between interrogations. *See id.* at 104. Since the officers here waited longer than that, we can not say that the period between interrogations was necessarily inadequate for constitutional purposes.[8]

As in *Mosley*, the officers here also gave Lafferty fresh *Miranda* warnings before questioning her during the second January 15 interrogation. However, unlike in *Mosley*, where different officers questioned the defendant during the first and second interrogations, Willgohs questioned Lafferty during both the first and second January 15 interrogations. Also unlike in *Mosley*, where the officers asked the defendant about two different crimes during the first and second interviews, Willgohs

---

[8]In relying on the two-hour time frame of *Mosley*, we do not suggest that any set period of time controls the analysis. Rather, the importance of the time between interrogations may vary depending on all of the other circumstances.

asked Lafferty about the same burglary during the first and second January 15 interrogations.

However, the *Mosley* factors are not necessarily dispositive under the circumstances here. Rather, they are tools we employ to help determine whether a suspect's assertion of *Miranda* rights was scrupulously honored. *See Mosley*, 423 U.S. at 106; *see also Vujosevic*, 844 F.2d at 1029. Given the circumstances here, it is evident that the second January 15 interrogation was not consistent with honoring Lafferty's assertion of her Fifth Amendment right to remain silent.

As noted earlier, the first January 15 interrogation ended when Lafferty told Willgohs, "if you're going to charge me, charge me. I'm not going to sit here for four to five hours like last time." Lafferty was then placed in a room to wait while officers prepared charges and continued questioning Mitchell; she remained silent while she waited. Officers then took Lafferty and Mitchell to the Magistrate to be arraigned; Lafferty remained silent during the ride. Mitchell then offered to tell the police about the burglary if they took him and Lafferty back to the police station and let them talk in private; Lafferty still maintained her silence while Mitchell and the troopers

31

negotiated this arrangement. Law enforcement officers took Lafferty and Mitchell back to the police station and put them in a room to talk privately as Mitchell had requested. Police interrupted their meeting three times to ask if they were ready to talk.[9] While Mitchell twice requested additional time, Lafferty said nothing when Willgohs checked to see if they were ready to talk. Eventually, Mitchell told Willgohs that they were prepared to give a statement; again, Lafferty neither said nor did anything to suggest she had changed her mind and was ready to talk to the police.

Notwithstanding the fact that Lafferty steadfastly maintained her silence, she was put in an interrogation room with at least five law enforcement officers and a confederate who had already agreed to give a statement about a crime that she was suspected of being involved. She was reread her

---

[9]These interruptions were equivalent to asking Lafferty if she wanted to make a statement despite her prior assertion of her Fifth Amendment privilege.

*Miranda* warnings[10], and asked more questions about the same crime that she had previously said she did not want to talk about.

Under *Miranda*, the onus was not on Lafferty to be persistent in her demand to remain silent. Rather, the responsibility fell to the law enforcement officers to scrupulously respect her demand. And it is clear that they failed to do so by putting Lafferty in an interrogation room with her alleged confederate after she had invoked her right to remain silent and after he promised to give a confession.

On this record, we do not conclude that the police consented to Mitchell's requests for a joint interrogation "for no other reason than to induce [Lafferty] to change [her] mind." *See Vujosevic*, 844 F.2d at 1029. Nonetheless, the fact that the

---

[10]The fact that the police gave Lafferty fresh *Miranda* warnings before resuming the second January 15 interrogation does not undermine our conclusion that the police did not scrupulously honor her right to remain silent. As noted earlier, "[p]olice can not, as if by alchemy, negate [a suspect's] invocation of his right to remain silent by mantra-like recitation of *Miranda* warnings. The warnings are not intended to be a mere ritual, the exercise of which guarantees the admissibility of any statement that is obtained in a custodial interrogation regardless of the circumstances." *Tyler*, 164 F.3d at 155. In fact, "the more times police inform a suspect of his rights in the face of his repeated invocation of those rights . . . [,] the clearer it becomes that the police must not mean what they say. This is exactly the type of subtle coercive pressure which the *Miranda* opinion condemned." *United States v. Hernandez*, 574 F.2d 1362, 1368 (5th Cir. 1978).

arrangement was not the result of an intentional scheme to undermine Lafferty's Fifth Amendment privilege does not mean that police scrupulously honored that right. *Mosley* and its progeny do not require a defendant who asserts a Fifth Amendment violation to establish that the officers intentionally set about to cause the defendant to change his/her mind. Under *Mosley*, it is clear that the cloak of the Fifth Amendment is not woven with such tenuous thread. Rather, *Mosley* simply requires that police scrupulously honor a defendant's Fifth Amendment privilege. Here, inasmuch as Lafferty did not join in any of Mitchell's requests or express her willingness to be interrogated after asserting the privilege, police were not justified in proceeding as if she had knowingly and voluntarily waived the right she had previously asserted. The fact that they did so is inconsistent with the obligation of scrupulously honoring Lafferty's right to cut off questioning.

As we have noted, the fact that Mitchell, rather than law enforcement officers, suggested the arrangement for the interrogation does not alter our analysis. If we remove Mitchell from this scenario, the violation of Lafferty's Fifth Amendment right is apparent. Absent Mitchell, the following transpired:

34

Lafferty stopped the first January 15 interrogation when she said that she did not want to answer any more questions; the interrogation immediately ceased, and Lafferty was placed in a room to wait while officers prepared documents to charge her with the burglary; state troopers then took her to the Magistrate Judge to be arraigned. Thereafter, the troopers brought her back to the police station, read her fresh *Miranda* warnings, and began questioning her about the burglary.

Mitchell's conduct can not absolve the police conduct here absent a valid and meaningful waiver by Lafferty. Otherwise, police could justify any manner of impermissible interrogations by relying on a suspect's confederate (when there is one) to defeat an assertion of privilege. Although the idea of a joint interrogation originated with Mitchell, the resulting interrogation and Lafferty's statements were obtained under circumstances that were inconsistent with scrupulously honoring her right to remain silent.[11] Thus, the district court erred in

---

[11]Our focus on the police officers' role in devising the tactic used in *Nelson* was a necessary part of our inquiry there into whether the ploy constituted an "interrogation." *See Nelson*, 911 F.2d at 934-35. Here, there is no question that putting Lafferty and Mitchell in the same room and then questioning them about the burglary was an interrogation. Thus, we need not focus on who authored the scheme leading to the violation.

failing to suppress the statements Lafferty made during the second January 15 interrogation.

B.

Lafferty also argues that the district court erred in failing to suppress the incriminating statements Mitchell made during the second January 15 interrogation. The district court reasoned that Lafferty's "silence and failure to deny statements by Mitchell . . . make the statements made by Mitchell adoptive admissions" under Fed. R. Evid. 801(d)(2)(B) because "an innocent defendant would have responded in order to deny the statements made rather than acquiescing in such statements by remaining silent after hearing and understanding those statements." 372 F. Supp. 2d at 459.

That reasoning is both puzzling and troubling. If allowed to stand, it would virtually eliminate the right to remain silent because a suspect's silence in the face of incrimination would be transformed into substantive evidence of guilt. That is precisely what the Fifth Amendment was intended to prevent. Under the district court's analysis, nothing would remain of the Fifth Amendment privilege, and the protection it intends would be transformed into an adoptive admission of guilt. Although it is

36

often difficult for lay jurors to accept that an accused's silence can not be considered in determining guilt, it is one of the cornerstones of the Bill of Rights, and courts must steadfastly protect the right if it is to have any real significance.

In explaining its reasoning to the contrary, the district court stated:

> The Court's ruling on this matter specifically is that there exists sufficient evidence to support a jury finding that an adoptive admission exists after considering this preliminary question of admissibility under [Rule] 104(a). That is to say the Government has proven by a preponderance of the evidence that [Lafferty]'s conduct manifested an intent to adopt Mitchell's statements. However, the final determination as to whether an adoptive admission was made by [Lafferty] must be left to a jury using the standard of beyond a reasonable doubt.

*Lafferty*, 387 F. Supp. 2d at 510 (quotation marks and citation omitted).[12]  We disagree. Lafferty had, of course, just been informed that she had the right to remain silent under *Miranda*.

Under Rule 801(d)(2)(B), a statement is not hearsay if "the statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth."  Whether a statement is admissible as an adoptive admission turns on (1) whether the statement was such that, under the circumstances, an innocent person would deny the

---

[12]In both *Lafferty I* and *Lafferty II*, the district court cited *United States v. Robinson*, 275 F.3d 371 (4th Cir. 2001), in support of its conclusion that Lafferty adopted Mitchell's statements under Rule 801(d)(2)(B).  However, that case is distinguishable.  In *Robinson*, co-defendants challenged the admission of a witness's testimony concerning their description of a murder they committed together.  The witness stated that she overheard (but did not see) the defendants jointly tell the story of how they shot a tow-truck driver.  She also stated that neither defendant contradicted or denied the other's rendition of the crime.  The trial court admitted the testimony, reasoning that, insofar as each defendant's statements were offered against the other defendant, the statements were not hearsay and admissible as adoptive admissions under Rule 801(d)(2)(B).  The appellate court upheld the district court's decision, concluding that the circumstances of the murderous tale were such that, had either defendant disagreed with the statement of the other, "he would have made his disagreement known" and that the scenario described by the witness provided sufficient facts for a jury to find that each defendant adopted the other's statement as his own.  *Id.* at 382-83.  However, the statements in *Robinson* were not made during an official interrogation.  Accordingly, the Fifth Amendment did not apply.

38

statements and (2) whether there are sufficient foundational facts from which the jury may infer that the defendant heard, understood, and acquiesced in the statement. Under the rule, "[a]doption or acquiescence may be manifested in any appropriate manner. When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue." Fed. R. Evid. 801 advisory committee notes.[13]

Of course, this is a criminal prosecution, not a civil proceeding. Under these circumstances, "[i]t is impermissible to penalize an individual for exercising [her] Fifth Amendment privilege when [she] is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that [she] stood mute or claimed [her] privilege in the face of accusation."

---

[13] The district court's ruling ignored the admonition in the Federal Rules of Evidence. Specifically, the Advisory Committee Notes to Rule 801(d)(2)(B) provide:

In criminal cases . . . troublesome questions have been raised by decisions holding that failure to deny is an admission: the inference is a fairly weak one, to begin with; silence may be motivated by . . . realization that "anything you say may be used against you"; unusual opportunity is afforded to manufacture evidence; and *encroachment upon the privilege against self-incrimination seems inescapably to be involved*.

Fed. R. Evid. 801(d)(2)(B) advisory committee notes (emphasis added).

*Miranda* 384 U.S. at 468 n.37. *See also United States v. Hale*, 422 U.S. 171 (1975); *Doyle v. Ohio*, 426 U.S. 610 (1976).

*Doyle* is particularly instructive here insofar as the Court reiterated the proposition that it is impermissible to penalize a defendant for invoking her Fifth Amendment privilege during a custodial interrogation. *Doyle* involved two defendants who made no post-arrest statements about their involvement in alleged drug transactions. Each defendant testified at trial that he had been framed. On cross-examination, the prosecutor asked the defendants why they did not tell the police they had been "set up" when questioned. *Id.* at 613-14. The Court concluded that impeaching the defendants on the basis of their failure to explain being "set up" during their custodial interrogations was fundamentally unfair because *Miranda* warnings inform a person of the right to remain silent and assure a suspect that his/her silence will not be used against him/her. 426 U.S. at 618-19.

The district court's ruling that Mitchell's statements are admissible against Lafferty as adoptive admissions thus violates the rule that "[t]he prosecution may not . . . use at trial the fact that [a defendant] stood mute . . . in the face of accusation."

40

*Miranda*, 384 U.S. at 468 n.37. Thus, the court's reliance on Rule 801(d)(2)(B) is misplaced. Although the circumstances here differ from the circumstances in *Hale* and *Doyle*, the result is the same. Neither *Miranda*, nor its progeny, limit the exclusion of a defendant's silence during a custodial interrogation to specific procedural and/or tactical contexts, and we decline to do so here. Rather, we hold that a court errs in permitting the government to use a criminal defendant's silence in the face of police interrogation.

Accordingly, Mitchell's statements can not be construed as adoptive admissions under Rule 801(d)(2)(B), and the district court erred in ruling them admissible.[14]

## C.

Because we conclude that the Fifth Amendment precludes admission against Lafferty of both the statements she made and the statements Mitchell made during the second January 15 interrogation, we need not reach the question of

[14]This does not, of course, mean that the police had to forego Mitchell's statement in order to protect Lafferty. Although Mitchell probably would not have confessed unless police allowed him to be interrogated together with Lafferty after offering them private time to meet, the police could obtain and use Mitchell's inculpatory statement under the circumstances here. However, it could only be used against Mitchell because only he waived the protection of *Miranda*.

whether those statements are also precluded by the Sixth

Amendment.